STATE

v.

Darryl J. BLACK.

No. 97–77–C.A.

Supreme Court of Rhode Island.

Nov. 16, 1998.

Aaron L. Weisman, Providence, for plaintiff.

Paula Rosin, Providence, for defendant.

Present: WEISBERGER, C.J. and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

### Introduction

This search-and-seizure case requires us to apply the so-called "plain-feel" doctrine. It also illustrates how important the sense of touch is to criminal law enforcement and to persons subjected to patdown searches.

After bringing a swerving automobile to a halt in the breakdown lane of a highway, a police officer observed the front-seat passenger seemingly attempt to stuff some unseen object inside the front of his pants. Conducting a roadside patdown of this individual's outer clothing, the officer felt what he believed to be a tube-like bag of contraband tucked just below the belt area. Pulling back the waistband, the officer reached inside, retrieved a transparent, plastic bag containing what looked to him like marijuana, and seized it for later use as evidence in prosecuting the passenger for unlawful possession of an illegal substance.

On appeal from his Superior Court conviction, the passenger, Darryl Black (defendant), challenges the denial of his motion to suppress the seized marijuana. The State of Rhode Island charged defendant with one count of possessing this illegal substance in violation of G.L.1956 § 21–28–4.01(C)(1)(b) and § 21–28–4.11. The defendant moved to suppress the drug evidence, arguing that it was the fruit of an unlawful search, but the hearing justice denied the motion. Thereafter, defendant stipulated to the facts elicited at the suppression hearing and to those contained in the prosecution's information package. As a result, the hearing justice found defendant to be guilty as charged and sentenced him to an eighteen-month suspended sentence and probation.

For the reasons voiced below, we sustain the appeal, vacate the conviction, and remand this case to the Superior Court so that the hearing justice may make additional factual findings and conduct further proceedings consistent with this opinion.

### Facts

Only two witnesses testified at the suppression hearing: the arresting officer, Rhode Island State Trooper Patrick Reilly (the trooper), and defendant. The trooper testified that he was on duty at approximately 5:45 p.m. on January 25, 1995, in the town of Tiverton, when he observed a southbound automobile on Interstate Highway Route 24 swerving repeatedly between the slow-speed and breakdown lanes. The trooper followed this vehicle for approximately a half-mile and then attempted to stop the car by engaging the overhead lights of his police cruiser. Although the driver responded by steering his car into the breakdown lane, he failed to stop; indeed, he maintained the car's previous velocity as it continued to proceed in the breakdown lane. All the while, according to the trooper, he kept his lights on and his cruiser in pursuit at a maximum distance of twenty feet behind the subject vehicle. During this time, the trooper said that he could see inside the car because it was well-illuminated not only by the remaining daylight—"it was dusk, more light than dark"—but also by his cruiser's take-down lights, high beams, and spotlight. As he tailed the car, the trooper observed two males in the vehicle: one in the passenger seat (later identified as defendant), and the driver. According to the trooper, the defendant-passenger was looking back at him, "keeping his eye on [the trooper] in a nervous fashion." After traveling another quarter of a mile, the car finally halted in the breakdown lane.

The trooper likewise stopped his cruiser, exited, and then approached the vehicle on the driver's side. During his approach, the trooper saw defendant repeatedly looking over his shoulder at him and "making several almost frantic movements towards his groin area, his waistband * * * like he was attempting to conceal something in his waistband." When the trooper reached the driver-side window, defendant ceased these movements and put his hands out. Keeping defendant "in [his] view the entire time," the trooper observed him hurriedly attempting to light a cigarette, and then frenetically fumbling with and ultimately dropping the lighter. After requesting and obtaining the driver's license and registration—a process that lasted approximately ten seconds—the trooper walked around the vehicle to the passenger side "because [he] wanted to see what [defendant] was putting in his pants [and] * * * [he] had a fear of a concealed weapon inside the pants."

The trooper ordered defendant to exit the vehicle and asked him what he had just tucked into his waistband. According to the trooper, defendant replied "[n]othing * * * like he was perhaps trying to hide something." The trooper repeated his question, and again, defendant nervously replied that it was nothing. Based upon his four years of experience as a state trooper, the trooper believed that defendant was exhibiting a much higher degree of agitation than the typical subject of a traffic stop.

At that point, the trooper began to pat down defendant "towards the waist, groin where [he] thought that [defendant] had stuffed the item." In touching this area, the trooper felt "some sort of an obstruction * * * an almost tube-like soft baggy of sorts." He testified that at that point, "[he] thought [the substance] was contraband." Consequently, the trooper pulled out defendant's waistband, reached inside, and withdrew a clear plastic bag containing a green substance that later tested positive as marijuana. On cross examination, defense counsel questioned the trooper further regarding his thoughts upon encountering what he believed to be the contraband. First, the trooper stated "well, I couldn't determine whether it was a weapon or not * * * but it was not a handgun and it was not a knife." Later, he ventured this attempted clarification: "I didn't determine what it was," but "[w]hat I thought it was is [sic] contraband." However, the trooper also admitted that he felt around and squeezed the area to determine whether the substance was contraband.

## Discussion

### 1. The Superior Court Suppression Hearing

#### a. The Court's Ruling

After hearing the evidence, the hearing justice stated that:

"[i]t's the object of the Court at a hearing such as this to determine as best as can be determined what the facts are that were in existence at the time of the stop to determine whether there was probable cause for that stop and to make sure that the police officer did do, in fact, what he was supposed to be doing and didn't go over the line and abrogate the rights of the defendant."

He then stated that as the hearing justice, he must "weigh the credibility of witnesses ** * [and] draw inferences that [he] believe[s] to be true from the facts as [he has heard] them." Accordingly, he found that the trooper focused on defendant from the inception of the stop; that after defendant continued his "furtive movements," the trooper's interest in defendant mounted; and that defendant was unusually nervous. The court concluded that the trooper was justified in patting down defendant and seizing the marijuana found on defendant's person: "I think he did everything he was supposed to do within the bounds of this officer, and he had reasonable suspicion. * * * Whether there was something there that shouldn't be there, it might not have been a weapon, but then it went to maybe it's contraband, so the motion to suppress is denied."

#### b. What the Court Did Not Say

The trooper's patdown search and drug seizure requires us to construe and apply the teachings of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).[1] During an investigatory stop of an individual whom a police officer reasonably suspects (1) has engaged in wrongdoing, and (2) may be armed and thus dangerous to the officer or others, *Terry* allows the officer to negate the pres-

1. On appeal, defendant raises arguments based solely on alleged violations of the Fourth Amendment to the United States Constitution. As a result, we have no warrant to examine the lawfulness of this stop and frisk under article 1, section 6, of the Rhode Island Constitution, which likewise prohibits the government from conducting unreasonable searches and seizures. Mindful of the fact that our State Constitution may provide citizens of this state with greater protections against government searches and seizures than those granted by the Fourth Amendment of the Federal Constitution, *see Duquette v. Godbout*, 471 A.2d 1359, 1361 (R.I.1984), we nonetheless proceed to analyze the legality of this search and seizure solely under the Federal Constitution, as that is the only violation alleged.

830

ence of an obvious weapon on the suspect—such as a gun, knife, or club—by conducting a limited and self-protective patdown search of the suspect's outer clothing. *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911. *Dickerson* holds that a police officer may seize contraband discovered during an otherwise lawful patdown search for weapons, provided that (1) it is immediately apparent to the officer upon feeling the "contour or mass" of the object in question that it constitutes contraband, *Dickerson,* 508 U.S. at 375–76, 113 S.Ct. at 2137, 124 L.Ed.2d at 345–46, and (2) the officer is still within the bounds of a permissible patdown search when the contraband is discovered. *See id.* at 373, 113 S.Ct. at 2136, 124 L.Ed.2d at 344.

 The *Dickerson* rule has been dubbed the "plain-feel" doctrine, *see, e.g., People v. Champion,* 452 Mich. 92, 549 N.W.2d 849, 854 (Mich.1996), after its plain-view analogue. *See Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (holding that an officer may seize non-threatening evidence unrelated to the search if the incriminating character of this other evidence lies within the officer's plain view and he or she need not conduct any further search). However, to ascertain the contour or mass of an unseen but felt object located inside a person's outer clothing, the searching officer typically may need to deploy more digital resources than a mere fleeting feel, a transient touch, or a brushing pass of the hand can provide. But if after engaging in whatever palpation is required to determine the item's contour or mass, the officer concludes that no obvious weapons are present on the suspect, then the plain-feel doctrine instructs that the officer cannot continue to manipulate the hidden object to determine if it is indeed contraband. *See Dickerson,* 508 U.S. at 378–79, 113 S.Ct. at 2138–39, 124 L.Ed.2d at 347–48; *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911. If the officer continues to search after concluding no obvious weapons are present, then the hearing justice should suppress any evidence

seized as a result of such a warrantless search. *See Dickerson,* 508 U.S. at 379, 113 S.Ct. at 2139, 124 L.Ed.2d at 348.

In this case, the Superior Court's decision on the suppression motion does not refer expressly to the *Dickerson* case or to its impact on this aspect of search-and-seizure law. Most significantly, the court's ruling is bereft of (1) any factual findings as to whether, upon ascertaining the contour or mass of the "almost tube-like baggy of sorts" stuffed inside defendant's waistband, it was immediately apparent to the trooper that this item was in all probability contraband, and (2) any findings as to whether the trooper was at that point still within his authority to search defendant's person under *Terry* or whether, having concluded previously that the object he felt was not an obvious weapon, he nevertheless continued to manipulate it to determine whether it was in fact contraband, thereby exceeding his authority to search under *Terry.*

**2. *Terry,* and *Dickerson***

 To decide whether the seizure of contraband discovered during an investigatory patdown was lawful, *Terry* and *Dickerson* compel a three-pronged inquiry. First, as a threshold matter, the suppression hearing justice should determine whether the initiation of a patdown search was justified. *See Terry,* 392 U.S. at 19–20, 88 S.Ct. at 1878–79, 20 L.Ed.2d at 904–05. During a roadside traffic stop, a police officer may pat down a vehicle-occupant's outer clothing to negate the presence of a weapon if the officer has a specific and articulable basis to suspect that "criminal activity may be afoot," and that the person may possess a weapon. *State v. Collodo,* 661 A.2d 62, 65 (R.I.1995) (quoting *Terry,* 392 U.S. at 30–31, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911). In making this determination, the hearing justice should consider the totality of the pre-patdown circumstances as perceived by the officer. *See State v. Tavarez,* 572 A.2d 276, 278 (R.I.1990).[2]

2. Within the context of a patdown search for weapons, we recognize the existence of variable degrees of reasonable suspicion that may, in turn, give rise to a variable scope of authority to search a suspect's person. For example, if an

officer observes a suspect making furtive movements towards a particular part of his or her body or clothing as if to hide something there, as was the case here, then the officer has a reasonable basis to conduct a more probing tactile

 If the officer is justified in conducting a patdown search for weapons, then the hearing justice should move to the second prong of the analysis: whether upon feeling an object within defendant's clothing, the object's "contour or mass [made] its identity [as contraband] immediately apparent" to the officer, *Dickerson*, 508 U.S. at 375, 113 S.Ct. at 2137, 124 L.Ed.2d at 346, before or contemporaneous with the officer's determination that it was not an obvious weapon. In order for contraband to be "immediately apparent," the officer must "believe that [the] object * * * is contraband without conducting some further search of the object." *Id.* at 375, 113 S.Ct. at 2137, 124 L.Ed.2d at 345 (citing *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112, 123 (1990); *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)). If the hearing justice finds that the item's status as contraband was immediately apparent, that is, "an object whose contour or mass [made] its identity immediately apparent to this officer," 508 U.S. at 375, 113 S.Ct. at 2137, 124 L.Ed.2d at 346, and that the officer made this determination before or at the same time as he or she concluded that the object was not an obvious weapon, then the contraband can be seized lawfully and should not be suppressed. If, however, the hearing justice concludes that the contraband's status was not immediately apparent to the officer after feeling its contour or mass, then the court should proceed to the third and final prong of the inquiry.

 In this third stage of the analysis, the hearing justice must determine to what extent, if any, a continuing patdown or feeling of the object was warranted to negate the presence of obvious weapons. The extent of any permissible further searching requires an examination of the holding in *Dickerson* in conjunction with *Terry*. Although an officer may not identify readily a hidden object's status upon his initial touching of the object through the suspect's clothing, the officer is entitled to ascertain the item's contour or mass to negate the presence of typical or obvious weapons. Accordingly, notwithstanding its requirement that the presence of contraband must be immediately apparent to the officer conducting the patdown, *Dickerson* permits such an officer to probe the contour or mass of an unseen but felt object until he or she negates the possibility that the suspect possesses a gun, knife, club, or some other such obvious weapon that the suspect could use to harm the officer. Thus, if the officer has not yet negated the possibility that the object he or she has located within a suspect's clothing is an obvious weapon, then the officer may continue to palpate the object up to, but no further than the point at which he or she negates the possibility that the object in question is a typical or obvious weapon.[3] If, in doing so, the officer feels an

search of this particular area than he or she *might otherwise possess absent the prior observance* of such activity. This latitude to conduct a more probing patdown search of a specific portion of a suspect's person or clothing, based on a particularized reasonable suspicion to do so, is consistent with the initial purpose of the patdown search—to negate the presence of an obvious weapon that may be hidden there.

3. This scope of a police officer's authority to continue a patdown search, consistent with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), presents at least one potential complication—the so-called razor-blade factor. The police may attempt to argue, for example, that in order to negate the presence of a razor blade or some other comparatively small and hard-to-detect item (for example, a hatpin), which conceivably could be used as a weapon, the police officer conducting the patdown may have to manipulate and/or prod a hidden object for a more extended period of time to determine that no small or unusual weapon is secreted within. In so doing, the police officer may be able, during the course of a purported lawful search for such weapons, to determine that the substance is contraband and claim to have seized it lawfully. If, however, such extended patdown searches were permissible routinely without a specific basis to do so, then it would undermine the constitutionally protected privacy concerns that the Supreme Court sought to protect in *Dickerson*. Thus, to avoid creating a *Dickerson* loophole that would swallow the rule established in that case, we hold that a police officer may conduct such a comparatively more probing search for a smaller, atypical weapon—such as a razor blade or hatpin—only if the antecedent circumstances give rise to some specific reasonable suspicion that the suspect is in possession of such a smaller, atypical weapon. Otherwise, the extent of the outer-clothing patdown search must be confined to negating the presence of typical weapons secreted in those places or areas where such weapons are apt to be found under the circumstances.

object that, based on his or her experience, is immediately apparent to his or her touch as contraband, then it may be seized lawfully.

As a result, the hearing justice's consideration of this third prong of the analysis should proceed as follows. First, the court should examine at what point during the search the officer negated the presence of an obvious weapon on defendant's person. Thereafter, the court should establish at what point during the patdown the officer determined that the felt object was contraband. If the officer negated the presence of a weapon in that location before he determined that the felt object was contraband, then the court should suppress the evidence. If, however, the officer determined that the felt object was contraband before or simultaneous with negating the presence of an obvious weapon—that is, if the officer was still within the confines of an otherwise valid *Terry* patdown search for weapons—then the court should not suppress the evidence of any contraband discovered in the patdown process.[4]

Constraining an officer any further, that is, prohibiting him or her from continuing to conduct a lawful weapons patdown search in that area merely because the object's status was not immediately apparent, would be tantamount to limiting the Supreme Court's benchmark *Terry* decision. We do not believe that the *Dickerson* Court intended to limit *Terry* in this fashion, and neither shall we. As the Supreme Court stated in *Dickerson*, "police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry* * * * so long as the officers' search stays within the bounds marked by Terry."

*Dickerson*, 508 U.S. at 373, 113 S.Ct. at 2136, 124 L.Ed.2d at 344. (Emphasis added.)

In *Dickerson*, the Court concluded that the search and seizure of the contraband was unlawful because it exceeded the scope of a permissible *Terry* patdown. *See Dickerson*, 508 U.S. at 378, 113 S.Ct. at 2138–39, 124 L.Ed.2d at 347–48 ("[T]he police officer in this case overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry* * * * [T]he officer's continued exploration of respondent's pocket *after having concluded that it contained no weapon* was unrelated to the '[t]he sole justification of the search [under *Terry:* ] * * * the protection of the police officer and others nearby' ") (quoting *Terry*, 392 U.S. at 26, 29, 88 S.Ct. at 1882, 1884, 20 L.Ed.2d at 908, 911) (emphasis added) (second omission in original).[5] However, assuming arguendo that the officer in *Dickerson* had remained within the confines of a lawful search for weapons under *Terry* —for example, if he had not yet concluded that the respondent's pocket contained no obvious weapon—the search and seizure of any contraband that was immediately apparent to the officer would have been lawful. Thus, a police officer may continue to conduct a weapons patdown search up to the point at which the officer negates the presence of an obvious weapon. This point may occur immediately upon the initial touching of the object, or it may require additional palpation to determine its contour or mass, depending upon the circumstances.

In examining these circumstances, the hearing justice must scrutinize the objective events surrounding the search. The de-

---

4. During the course of a weapons patdown, an officer may feel an unknown object whose identity he or she is uncertain about, though the officer has not yet negated the presence of an obvious weapon. In this situation, the question arises whether the officer may continue to palpate the felt but unseen object until he or she concludes that the item in all likelihood is or is not a weapon, contraband, or something else entirely, or whether the officer must cease any further digital manipulation. In our opinion, the officer may continue to palpate the object up until the point that he or she negates the possibility that the object is an obvious weapon. Once the officer has determined that the unseen object is not

an obvious weapon, he or she must end any further touching or manipulation of the object to determine if it is contraband.

5. This is the critical distinction between this case and *Dickerson*. Here, in contrast to *Dickerson*, it is not at all apparent from the record that the officer continued to search defendant's waistband *after* concluding that it contained no obvious weapon and *before* concluding that the tubelike bag he felt was contraband. Both of these circumstances must be found to exist before *Dickerson* compels suppression of any seized contraband.

terminative factor should not be the subjective beliefs or hunches of the police officer(s) involved. Rather, the hearing justice should focus on whether and to what degree a reasonable officer under the circumstances would find it necessary to continue his or her patdown search to negate the presence of an obvious weapon. As we stated in *State v. Alamont,* 577 A.2d 665 (R.I.1990), "the issue is whether [or not] a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger. * * * And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his [or her] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he [or she] is entitled to draw from the facts in light of his [or her] experience." *Id.* at 667 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909). Once the officer has negated the presence of an obvious weapon, however, any further searching without reasonable suspicion to do so is prohibited.

■ In so holding, we also recognize the potentially lower degree of reliability of an officer's sense of touch than his or her sense of sight for purposes of seizing "immediately apparent" evidence of contraband during a roadside encounter like this one. A police officer, through sight alone, may be able to determine whether an object in plain view is a weapon or not in a shorter span of time and more accurately than it would take to do so in a patdown search. Accordingly, we acknowledge that an officer conducting a tactile search for a weapon may need a marginally greater exploratory scope—both as to extent and duration—than he or she would have when searching and seizing objects in plain view of the officer.

### 3. Application

■ Here, the hearing justice addressed only the first prong of the analysis required by *Terry* and *Dickerson.* He concluded that the trooper justifiably conducted a patdown search of the defendant to negate the presence of a weapon. We agree with this aspect of his ruling. Based upon the circumstances preceding the patdown—namely, the defendant's furtive and frantic movements towards his groin, his continuous looking back at the trooper, and his unusually high degree of overall nervousness—we conclude that the trooper possessed sufficient reasonable suspicions about the defendant's actions to subject him to a weapons patdown search. *See State v. Rios,* 702 A.2d 889, 889 (R.I.1997) (holding that this Court shall review the trial justice's conclusion about the existence of reasonable suspicion de novo). Nevertheless, the hearing justice failed to make precise factual findings as to the second and third prongs of what we deem to be the requisite analysis. We therefore vacate the defendant's conviction and remand this case to the Superior Court so that the hearing justice may make these findings and conduct such further proceedings as may be required after doing so.

### Conclusion

We recognize, as we must, the continuing vitality of the immediately apparent test as articulated in *Dickerson.* However, we also acknowledge, consistent with the longstanding rationale of *Terry,* the exigent need during investigatory stop-and-frisk situations to protect police officers from the presence of hidden weapons on persons suspected of wrongdoing. Accordingly, during the course of an investigatory stop and patdown of a person suspected of wrongdoing and of carrying a concealed weapon, an officer may not continue to search and seize upon touching a hidden object on the person being frisked, if its potential status as a weapon has been negated before its status as nonthreatening contraband has become apparent to the officer. An officer, however, is authorized to continue an otherwise valid patdown search for weapons until that point at which he or she has negated the possibility that the suspect possesses an obvious weapon. Any object that the officer encounters during that search "whose contour or mass makes its identity immediately apparent" as contraband can be seized. *Dickerson,* 508 U.S. at 375, 113 S.Ct. at 2137, 124 L.Ed.2d at 346. Thus, the defendant's appeal is sustained, and the judgment of conviction is vacated. This case is remanded to the Superior Court

for further proceedings and findings consistent with this opinion.