STATE

v.

Juan Bautista GUZMAN.

No. 98–96–C.A.

Supreme Court of Rhode Island.

April 21, 2000.

Virginia M. McGinn, Aaron L. Weisman, Providence, for Plaintiff.

Janice M. Weisfeld, Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

FLANDERS, Justice.

After watching a gunman flee on foot from the crime scene, an eyewitness to a fatal shooting called 911, described the shooter to the police, and specified the direction that he was running when last observed. More particularly, he also told the police that the fugitive was a black man wearing a red baseball cap and a hooded black jacket, a description which the police then broadcast to officers in the field and to those coming on duty. Twenty minutes later, within twelve blocks of the murder site, a police officer spotted a male suspect whose appearance matched the broadcast description of the shooter. When the officer approached the suspect and grabbed him by the arm, she noticed his pulse was racing. Under these circumstances, did the officer possess probable cause to place the suspect in a patrol car and then drive him to the crime scene so the eyewitness could attempt to identify him as the shooter? Yes, we hold, for the reasons recounted below.

### Facts and Travel

On September 12, 1996, Steven Willis (Willis) was sitting by a window in his Providence home on Farragut Avenue. He was talking on the phone to his girlfriend and playing a popular video game when he noticed a maroon Pontiac Grand Am pull over to the curb across the street. Moments later Willis heard four or five gunshots outside. He looked out the window and saw a man standing at the Grand Am's passenger-side door, pointing a gun into the car. He then watched as this man bolted away from the car and sprinted toward Roger Williams Park. Immediately Willis called 911. He described the gunman as a black male wearing a red baseball cap and a hooded black jacket. When the police arrived minutes later, Willis repeated this description to the responding officers and pointed out the direction in which the shooter had fled.

The police broadcast to the officers in the field a description of the gunman and the direction in which he was last seen running. The broadcast identified the suspect as a black male who was wearing a red baseball cap and a hooded black jacket. Officer Michelle Tella (Officer Tella) heard this description during the roll call for her shift and also shortly thereafter, while she was on patrol. Approximately twenty minutes after the shooting she was patrolling in her squad car in an area ten to twelve blocks from the Farragut Avenue crime scene, located in the same direction toward which Willis had seen the killer flee after the shooting. In a crowd gathered at the site of a car accident, Officer Tella noticed a man—who turned out to be defendant Juan Bautista Guzman (Guzman)—mingling with other onlookers. The suspect's appearance matched the police-broadcast description of the killer: he was a black male wearing a red baseball cap and carrying a hooded black jacket rolled up under his arm. When Guzman started to leave, Officer Tella got out of

her car, approached him from behind, and grabbed his left arm just above his elbow. She felt Guzman's pounding pulse and asked him why he was nervous. Guzman responded that "police make me nervous." She then frisked him, placed him in the back of her cruiser, and whisked him back to the murder scene on Farragut Avenue.

Meanwhile, other police officers investigating the shooting had found the victim, Jorge Diep, where Willis last saw him: slumped over in the Grand Am, dead in the driver's seat. The medical examiner testified that five bullets fired from close range had ripped into the right side of Diep's body. Besides Guzman, the police also brought another suspect to Farragut Avenue for Willis to look over. Nevertheless, Willis positively identified Guzman as the gunman. The police then ushered Guzman to the police station where he signed a form acknowledging receipt of his rights and later confessed to the shooting.

Before trial, Guzman moved to suppress all evidence obtained as a result of his arrest, including his confession. He argued that the police had seized him in violation of his state and federal constitutional protections against unreasonable searches and seizures. The trial court denied this motion, ruling that the match between Guzman's appearance and the broadcast description of the killer, coupled with the officer's perception of his racing pulse, provided Officer Tella with more than the requisite cause to detain Guzman so that the eyewitness could attempt to identify him as the shooter. The trial justice believed that, under the circumstances, Officer Tella would have been derelict in her duties had she not arrested Guzman and determined whether Willis could identify him as the murderer. As a result, the trial justice denied the motion to suppress Guzman's later confession. The court then proceeded to find Guzman guilty of second-degree murder, carrying a pistol without a license, and carrying a dangerous weapon when committing a crime of violence.

Guzman appeals from these convictions. He asserts that the police violated his rights under the Fourth Amendment to the United States Constitution and article 1, section 6, of the Rhode Island Constitution when the officer stopped him on the street, placed him in a patrol car, and then transported him to the crime scene for an attempted identification by an eyewitness to the shooting—all allegedly without probable cause and without Guzman's consent.

## Standard of Review

■■■■ When scrutinizing a trial court's findings of historical fact in ruling on a motion to suppress, we employ the clearly erroneous standard of review. *See State v. Carter*, 744 A.2d 839 (R.I.2000). But we review de novo a probable-cause-to-arrest determination, because this type of mixed-law-and-fact ruling implicates constitutional rights. *See State v. Abdullah*, 730 A.2d 1074 (R.I.1999).

## Analysis

■■■ The United States Supreme Court has held that when police "forcibly remove a person from his home or other place in which he is entitled to be and transport him to [a place], where he is detained, although briefly, for investigative purposes[,] * * * such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause." *Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705, 710 (1985). Accordingly, when Officer Tella seized Guzman on the street, placed him in her locked police cruiser, and then transported him to the murder scene for identification purposes, she arrested Guzman as a matter of law.

■■■ But Guzman asserts that Officer Tella's arrest violated his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution and by

article 1, section 6, of the Rhode Island Constitution,[1] because she lacked probable cause at that time to believe that he had committed any crime. Indeed, this Court has held that the legality of an arrest is to be determined by the existence of probable cause at the time of the arrest and not by what subsequent events may disclose. *See State v. Firth,* 418 A.2d 827 (R.I.1980). The key question, then, is whether the facts and circumstances at the time Officer Tella arrested Guzman establish that she possessed probable cause to do so.

■ The United States Supreme Court has held that a police officer may arrest a suspect without a warrant if, before the arrest, the officer has probable cause to believe that the suspect has committed a crime. *See Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The existence of probable cause to arrest without a warrant depends on whether, under the totality of the circumstances, the arresting officer possesses sufficient trustworthy facts and information to warrant a prudent officer in believing that the suspect had committed or was committing an offense. *See Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■ In *State v. Belcourt,* 425 A.2d 1224 (R.I.1981), an officer detained and arrested a suspect based upon a crime victim's description of the suspect's physical appearance and clothing. We held that the victim's description of the suspect was detailed enough to uphold a finding of probable cause to arrest the suspect.[2] *Id.* at 1227. Establishing the existence of probable cause to arrest a person does not require the same degree of proof needed to determine whether that person is guilty of the crime in question. *Draper,* 358 U.S. at 311–12, 79 S.Ct. at 332, 3 L.Ed.2d at 331. "In dealing with probable cause * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949). And "[o]ne of the most important elements in determining whether probable cause existed is satisfied when the police know a crime has actually been committed." *State v. Frazier,* 421 A.2d 546, 550 (R.I.1980). Although a suspect's apparent nervousness alone cannot elevate reasonable suspicion to the level of probable cause, a police officer may consider the suspect's demeanor upon encountering the police, including any observed nervousness, as one factor within the officer's probable-cause calculus. Finally, we review a defendant's assertion that he or she was arrested without probable cause in light of "the mosaic of facts and circumstances * * * viewed cumulatively 'as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training.'" *In re Armand,* 454 A.2d 1216, 1218 (R.I.1983).

Consistent with the above-cited cases, we hold that Officer Tella possessed the requisite probable cause to detain and arrest Guzman when she stopped him on the street and placed him in the cruiser. Our conclusion is based upon (1) her definite knowledge that a crime had been committed; (2) the match between Guzman's ap-

---

**1.** Article 1, section 6, of the Rhode Island Constitution provides:

"The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized."

**2.** In *State v. Belcourt,* 425 A.2d 1224, 1225 (R.I.1981), the victim described the suspect as a white male with a beard and dark hair who was five feet eight to five feet ten inches tall and wore dark clothing and a cross and chain around his neck.

pearance and the eyewitness' description of the gunman's gender, race, and clothing; (3) the arrest's proximity in time (twenty minutes from the crime's commission) and (4) place (ten to twelve blocks from the murder scene) (5) at a location that was consistent with the direction in which the gunman had fled after the shooting; and (6) the suspect's extreme nervousness when the officer stopped him. In considering the totality of these circumstances, we are convinced that the eyewitness' description of a black male wearing a red baseball cap and a hooded black jacket, juxtaposed with the above-listed factors, was sufficiently specific for Officer Tella to seize Guzman and bring him to the eyewitness for an attempted identification. This "mosaic of facts and circumstances," *id.,* established all the probable cause that Officer Tella required to arrest Guzman without a warrant.

### Conclusion

"When the seizure of a person is based upon probable cause * * * the taking of the evidence is legal if the officer immediately effects an arrest." *Belcourt,* 425 A.2d at 1227. Because probable cause supported Guzman's seizure, the eyewitness' later identification of Guzman as the shooter and Guzman's still later confession to the crime were not the fruits of a poisonous evidentiary harvest. In short, the Superior Court properly denied Guzman's suppression motion. Hence, we deny Guzman's appeal and affirm the judgment of conviction.