**STATE**

v.

**Marc GOMES.**

No. 2000–42–C.A.

Supreme Court of Rhode Island.

Jan. 8, 2001.

Virginia M. McGinn, Aaron L. Weisman, Providence, For Plaintiff.

Richard K. Corley, Providence, For Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

Following his convictions, after a Superior Court jury trial, on one count of first-degree murder and one count of carrying a pistol without a license, and after sentence

and final judgment entered thereon, the defendant, Marc Gomes (Gomes), appeals to this Court, seeking reversal of his convictions and a new trial.

## I

### Facts and Procedural History[1]

■ At approximately 1 a.m., on November 25, 1997, the decedent, Robert Wray (Wray), was cold-bloodedly shot dead on the doorstep of his mother's apartment at 8 Whelan Road, in the Hartford Avenue Housing Complex in Providence. Minutes later, the police arrived, and they spoke to Wray's friend, Tavell Yon (Yon), who told them that he had been visiting at the apartment when the shooting occurred.

Yon told the police that shortly before 1 a.m., he and Wray had been sitting in the living room watching television when he heard a knock at the rear door of the apartment. He said he answered the door knock and encountered a young black male whom he never had seen before. The young man asked to speak to Wray, so Yon called Wray to the door and then returned to the living room. From the living room, Yon overheard the young man ask for "Frankie" and then tell Wray that: "you know who I am, I'm Frankie's cousin." Wray informed him that Frankie was not in the apartment, and the visitor then left.

Several minutes later, there was a second knock at the rear door. Once again, Yon went to the door and encountered the same young man, who again said he was

looking for Wray. Yon again called Wray to the door and then went back inside the apartment. Within seconds, Yon heard a loud bang sounding like a gunshot and immediately looked over to where Wray had been standing in the doorway. He saw Wray now lying on the ground with one foot extending inside the door opening. Wray's younger brother, who also was in the apartment, immediately dialed 911 for police assistance. The police arrived within minutes. Yon then related to one of the officers the events that had taken place before the shooting and described the young stranger at the door as:

"a short black male with Jerry curls with a moustache. He had craters and pimples in his face and he was wearing a black leather jacket."

The description of the murder suspect was immediately transmitted via the police broadcast system to all police personnel in the area, along with a warning that the suspect could be armed and dangerous.

After hearing the broadcast, one officer who immediately responded to the shooting scene was Patrolman Jose Deschamps (Officer Deschamps). Officer Deschamps briefly assisted in securing the crime scene and then proceeded a short distance down Hartford Avenue to the Olneyville Square section to search for the suspect. While in Olneyville Square, the officer decided to go to a nearby "Store 24," better known as "Sam's," where he was friendly with the employees. He wanted to alert them that a murder had just been committed a short distance away and the suspected murderer

1. The facts we relate here are taken from the testimony of witnesses who testified at the trial. The facts that are reported in Gomes's appellate brief are based primarily upon what Gomes told the police while at police headquarters following his arrest. Gomes did not testify; thus the exculpatory statement of facts that he related to the police constitutes pure hearsay. See State v. Harnois, 638 A.2d 532, 535–36 (R.I.1994).

For some unexplained reason, it was the state prosecutor who, in questioning Detective Robert S. Clements, had the officer relate to the jury all that Gomes wanted the

jury to hear without his having to testify and be cross-examined. In Harnois, 638 A.2d at 535–36, we said that such evidence was clearly inadmissible. We, of course, do not fault Gomes for accepting the unsolicited assistance rendered to him by the state's prosecutor. However, we still view Gomes's exculpatory statements that he treats now as established facts in his appellate brief with some degree of skepticism, especially when viewed in light of his later and contrary admissions of guilt made to the trial justice at the time of his sentencing.

was at large and believed to be armed. The officer was concerned for the employees' safety because recently they had been the victims of an armed robbery and because the store was one of the few places that remained open in the Olneyville Square area at that early-morning hour. The officer arrived at the store ten to fifteen minutes after the shooting. As he entered, he observed a person who appeared to be making a phone call from a pay telephone located on the outside wall of the store. The officer was unable to see the person's face. After entering the store, Officer Deschamps described the shooting suspect to the store employees and warned them that the subject might be armed and dangerous. He then left the store.

As he exited, Officer Deschamps again looked in the direction of the person he had observed earlier, and noticed that he was still using the outside public telephone. This time, however, he looked more closely at the individual and was able to see his face. He observed the individual to be a black male of approximately "five foot four to five foot six" inches in height, with a "crater face, or pimples," and "slicked, very greasy" hair with "Jerry curls." He also observed that the man, despite the cold night weather, was not wearing any jacket, but "was sweating." Recalling the police radio description of the shooting suspect and relating it to that of the male individual using the telephone, who also appeared to be very nervous and sweating, Officer Deschamps's suspicions were aroused. He started to approach the young man. While doing so, he began asking him several rapid questions concerning the person's identity and what was he doing out so late. As he did, the young man appeared to become more nervous and began "stuttering, mumbling his words" while attempting to answer the officer's questions. He appeared to be "very much in a nervous state."

When Officer Deschamps reached where the young man was standing, he attempted to place his right hand on the young man's left shoulder to initiate a protective pat-down search for possible weapons. Just then, the young man suddenly jerked back, and as he did, Officer Deschamps's arm accidentally slid down the person's side and he felt what he believed to be the bulk of a gun under the young man's shirt. He quickly lifted the shirt and observed a loaded 9–millimeter pistol in the person's waistband. He immediately pulled it out and observed it to be cocked and ready to fire. The officer then placed the pistol on the ground and secured it with his foot. While detaining the young man, Officer Deschamps immediately radioed for police back up assistance to aid in placing the young man under arrest.

Meanwhile, another officer, Patrolman Charles Matracia (Officer Matracia), who had just left the murder scene, was driving through Olneyville Square when he heard Officer Deschamps's radio call for assistance. At the time, he was driving the witness Yon to the Providence police headquarters to be interviewed. Officer Matracia quickly made a "U-turn" in the road and within seconds he was about five feet from where Officer Deschamps was detaining the young suspect. Upon seeing Gomes, Yon, seated in the police vehicle, suddenly exclaimed "that's him right there" and, he "was the guy that came to the door." Officer Matracia then jumped from his police vehicle and proceeded to assist Officer Deschamps in placing the suspect under arrest and securing the pistol found on him. The young man was placed in a police vehicle and taken to police headquarters. Shortly thereafter, Yon was interviewed at the Providence police headquarters. He gave a detailed statement in which he reiterated his earlier identification of the young man, now identified as the defendant, Marc Gomes. He said that Gomes "was the guy that came to the door" and that he "saw him clearly." He added that "the only thing different [from when he originally described Gomes] was that the guy wasn't

wearing a leather jacket anymore, but it definitely was the same guy that came to the door."

Gomes was later indicted, tried before a Superior Court trial jury, and convicted both for the first-degree murder of Robert Wray and for carrying a pistol without a license. This appeal followed. In his appeal, Gomes contends that the trial justice committed various errors during trial, and for those alleged errors, he seeks reversal of his convictions and a new trial.

Additional facts will be noted as required in the course of this opinion.

## II

### The Police Broadcast

■ Gomes asserts here on appeal that the description given of the suspected murderer by Tavell Yon to Officer Thomas Calabro and then broadcast by Calabro via police radio to other officers in the immediate area of the murder scene constituted "rank hearsay" and should not have been admitted into evidence at his trial, and that its admission constituted prejudicial error.

■ "It is axiomatic that an out-of-court statement is not hearsay unless it is offered for the truth of the matter asserted." *State v. Johnson,* 667 A.2d 523, 530 (R.I.1995) (citing *State v. Brash,* 512 A.2d 1375, 1379 (R.I.1986)). "Statements not offered to prove the truth of what they assert are not hearsay and as such do not require the assistance of an exception to the hearsay rule in order to be admissible." *In re Jean Marie W.,* 559 A.2d 625, 629 (R.I.1989) (citing *Gordon v. St. Joseph's Hospital,* 496 A.2d 132, 136 (R.I. 1985)).

■ In the present case, "[t]he entire purpose of [Officer Deschamps's] testimony was to show why he apprehended [the defendant]. It was not objectionable hearsay because the radio message was not offered to prove [the defendant's] guilt." *State v. Palmigiano,* 112 R.I. 348, 359, 309 A.2d 855, 862 (1973). *See also State v.*

*Mastracchio,* 112 R.I. 487, 498, 312 A.2d 190, 197 (1973). It is well settled that reliable hearsay may be used in order to establish probable cause for the purpose either of an arrest or issuance of a warrant. *See, e.g., Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Rule 801 of the Rhode Island Rules of Evidence defines hearsay as being "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Gomes apparently neglects to note that Rule 801(d)(1) provides that an out-of-court statement is *not* hearsay if:

> "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (C) one of identification of a person made after perceiving the declarant."

In this case, the declarant was Tavell Yon. At the murder scene, Tavell Yon gave the description of the suspected murderer to Officer Calabro within minutes of the shooting. He later testified under oath at the defendant's trial. He was subjected to cross-examination concerning his identification and description of the person who had lured his friend, Robert Wray, out of the apartment to be shot and killed, and confirmed the accuracy of the description that was broadcast by Officer Calabro.

Thus, the pertinent inquiry for this Court to undertake is not, as Gomes contends, that the police radio description broadcast was inadmissible hearsay, but instead, whether it was sufficiently reliable when relayed by Officer Calabro to Officers Deschamps and Matracia to constitute

the probable cause necessary to permit the officers later to detain, arrest and search Gomes in Olneyville Square minutes after the murder of Robert Wray. That was the purpose for the testimony concerning the radio broadcast of the murder suspect's description and not whether the murderer was, in fact, Gomes. Thus, Gomes's "rank hearsay" allegation of error is without merit.

### III

### The Seizure of the Gun

In his appeal, Gomes also contends that Officer Deschamps lacked reasonable suspicion to approach and detain him while he simply was using the telephone outside Sam's store in Olneyville. He additionally asserts that the officer had no legal right to conduct a pat-down search of him before his arrest and had no probable cause later to arrest him. In his appellate brief, Gomes contends that the trial justice erred in permitting Officer Deschamps "to testify to the seizure of the gun." He bases that contention on his assertion that "Deschamps's testimony establishes that he searched Marc Gomes simply because he was in the neighborhood where the shooting occurred."

▮ That assumption by Gomes simply is erroneous. It assumes the nonexistence of the articulable and undisputed facts upon which the officer relied and acted upon in detaining and later arresting Gomes. The record discloses that when Officer Deschamps unexpectedly came upon Gomes in Olneyville Square, where Gomes was purporting to be using the public telephone on the outside wall of Sam's store, the officer had just minutes

before left the murder scene at 8 Whelan Rd., where he had observed the murder victim's body. He was aware that the victim had been lured out of the Whelan Road apartment and shot to death. He also was aware that a person who was visiting at the apartment had twice talked with and seen the young black man who had lured the victim out of the apartment and had given a detailed description of him to the police. Having been given the suspect's description and information that the suspected murderer had fled from the murder scene and might still be armed, the officer also was aware that Sam's store in Olneyville Square was but a short run down Hartford Avenue from the murder scene. That was the nature of the information possessed by Officer Deschamps when he came upon Gomes in Olneyville Square and observed that Gomes matched perfectly the broadcast description of the suspected murderer that had been given to Officer Francis Calabro at the murder scene.[2]

▮ "[A] police officer may conduct an investigatory stop, provided [the officer] has a reasonable suspicion based on specific and articulable facts that the person detained is engaged in criminal activity." *State v. Abdullah,* 730 A.2d 1074, 1076 (R.I.1999) (per curiam) (quoting *State v. Halstead,* 414 A.2d 1138, 1147 (R.I. 1980)). "An investigatory stop differs from a full arrest and search both in the duration of the detention and in the quantum of suspicion necessary to conduct it." *In re John N.,* 463 A.2d 174, 176 (R.I. 1983). "An investigatory stop is defined as '[a] brief stop of a suspicious individual, in order to determine his [or her] identity or

---

**2.** Although the defendant was not wearing a black or brown leather jacket, that fact alone does not defeat a finding of reasonable suspicion, because "[i]t is proper for the police to take account of the 'possibility that by a change of circumstances or efforts at concealment some aspects of the description may no longer be applicable.'" *State v. Clark,* 721 So.2d 1202, 1205 n. 2 (Fla.Dist.Ct.App.1998) (quoting 4 Wayne LaFave, *Search and Seizure*

§ 9.4(g) at 202 & n. 316 (3d ed.1996)). "[I]nvestigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by the victims or witnesses may be in error. What must be taken into account is the strength of those points of comparison which do not match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable." *Id.*

to maintain the status quo momentarily while obtaining more information, [such a stop] may be most reasonable in light of the facts known to the officer at the time.'" *Abdullah,* 730 A.2d at 1076 (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972)).

■ In *Abdullah,* we stated that:

"Numerous factors exist which may contribute to a finding of reasonable suspicion of criminal activity. * * * Some of the factors that may contribute to a reasonable suspicion of criminal activity include the location in which the conduct occurred, the time at which the incident occurred, the suspicious conduct or unusual appearance of the suspect, and the personal knowledge and experience of the police officer." 730 A.2d at 1077.

"During an investigatory stop of an individual whom a police officer reasonably suspects (1) has engaged in wrongdoing, and (2) may be armed and thus dangerous to the officer or others, *Terry* allows the officer to negate the presence of an obvious weapon on the suspect—such as a gun, knife, or club—by conducting a limited and self-protective patdown search of the suspect's outer clothing."[3] *State v. Black,* 721 A.2d 826, 829–30 (R.I.1998).

In *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Court expanded *Terry* to permit a policeman who has reasonable suspicion grounded in specific and articulable facts to conduct a *Terry* stop to investigate that suspicion in connection with a *completed* felony. The Court in *Hensley,* reversed a Sixth Circuit Court of Appeals holding that had determined that *Terry* manifested a clear intention to restrict investigative stops to situations involving only the investigation of *ongoing* crimes. The Court noted:

"We do not agree with the Court of Appeals that our prior opinions contemplate an inflexible rule that precludes police from stopping persons they suspect of past criminal activity unless they have probable cause for arrest. To the extent previous opinions have addressed the issue at all, they have suggested that some investigative stops based on a reasonable suspicion of past criminal activity could withstand Fourth Amendment scrutiny. Thus *United States v. Cortez,* 449 U.S. 411, 417, n. 2 [101 S.Ct. 690, 66 L.Ed.2d 621] (1981), indicates in a footnote that '[o]f course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.' And in *United States v. Place,* 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983), decided barely a month before the Sixth Circuit's opinion, this Court stated that its prior opinions acknowledged police authority to stop a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.' *Id.,* at 702 [103 S.Ct. 2637] (emphasis added). *See also Michigan v. Summers,* 452 U.S. 692, 699, and n. 7 [101 S.Ct. 2587, 69 L.Ed.2d 340] (1981). Indeed, *Florida v. Royer* [460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)] itself suggests that certain seizures are justifiable under the Fourth Amendment even in the absence of probable cause 'if there is articulable suspicion that a person *has committed* or is about to commit a crime.'" *Hensley,* 469 U.S. at 227, 105 S.Ct. at 679–80, 83 L.Ed.2d at 611.

■ In this case, when Officer Deschamps determined that Gomes fit the description of the suspected murderer, he approached Gomes to inquire of his identity and presence. He noticed that Gomes grew very nervous and began to stutter and mumble in response to his questions. When the officer came close to Gomes and reached out in an attempt to pat him down for possible weapons, Gomes suddenly jerked back away from the officer. As he did, the officer's hand accidentally brushed

**3.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

along Gomes's side, and the officer then felt a "bulk" that he immediately believed to be a gun. Officer Deschamps quickly lifted Gomes's shirt and observed a 9–millimeter pistol tucked under his waistband. The officer seized the gun and observed that it was cocked and ready to fire. He put the pistol on the ground, placed his foot on it to secure the pistol and radioed for police assistance to assist in arresting Gomes and transporting him to police headquarters.

■ We are convinced from the record of events in this case that when Officer Deschamps approached Gomes he had more than probable cause not only to detain but also to arrest Gomes and, incidental to that arrest, to search Gomes to determine whether he was armed.[4] The trial justice did not err in permitting the testimony of Officer Deschamps about his seizure of the gun from inside Gomes's waistband. Indeed we need only cite to our recent holding in *State v. Guzman*, 752 A.2d 1, 4 (R.I.2000), for authority to reject Gomes's contention of error regarding Officer Deschamp's testimony concerning his arrest of Gomes and seizure of the pistol that was later determined to be the actual murder weapon.

In *Guzman*, we stated that:

"a police officer may arrest a suspect without a warrant if, before the arrest, the officer has probable cause to believe that the suspect has committed a crime. * * * The existence of probable cause to arrest without a warrant depends on whether, under the totality of the cir-

cumstances, the arresting officer possesses sufficient trustworthy facts and information to warrant a prudent officer in believing that the suspect had committed or was committing an offense." *Id.*

Our *de novo* review of the trial evidence convinces us that Officers Deschamps and Matracia had probable cause to arrest and search Gomes when they came upon him a short distance from the scene of the murder.

## IV

### The Opinion Evidence

■ At trial, Officer Robert Badessa, a twenty-five year veteran of the Providence Police Department and a seven-year member of its Bureau of Criminal Identification Unit (the "BCI Unit"),[5] testified about his investigation of the crime scene and his collection and documentation of evidence. On appeal, and for the first time, defendant attempts to challenge Officer Badessa's qualifications to testify about the dissipation of gunshot residue from articles of clothing.

During the trial, Officer Badessa testified that the recovery of trace evidence of gunshot residue from clothing is affected by:

"[j]ust the movement of the clothing, just the movement of somebody's hands and firing the weapon, all of them movement [*sic*], and the, you know, just air around you as you're waving an arm, swinging. It dissipates very quickly."

---

4. "Probable cause, as the very name implies, deals with probabilities. These are not technical; they are the factual and practical considerations in every day life on which reasonable and prudent men, not legal technicians, act. Probable cause exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been or is being committed. * * * Probability, and not a prima facie showing, of criminal activity is the standard for determining probable

cause * * * and the standard of proof is accordingly correlative to what must be proved." *Saunders v. Commonwealth*, 218 Va. 294, 237 S.E.2d 150, 155 (1977).

5. Officer Badessa described the BCI Unit as the division that "is charged with the responsibility of covering major crime scenes including rapes, murders, burglaries, robberies, anything felonious, crimes—documenting crime scenes through photographs, and with diagrams if need be."

The defendant at no time voiced objection to that testimony at trial.

 We often have repeated that a "basic rule of our appellate practice is that this [C]ourt will not review objections that were not raised at trial." *State v. Morris*, 744 A.2d 850, 859 (R.I.2000) (quoting *State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I. 1999)). " 'Consequently, allegations of error committed at trial are considered waived if they were not effectively raised at trial, despite their articulation at the appellate level.' " *Id.* (quoting *Bettencourt*, 723 A.2d at 1107–08). However, assuming, arguendo, that the issue had been raised below, the defendant's appeal on this issue would be unavailing.

 "The qualification of an expert is a matter addressed to the sound discretion of the trial justice, and the exercise of that discretion will not be disturbed on appeal absent abuse." *Bettencourt*, 723 A.2d at 1112 (quoting *DeChristofaro v. Machala*, 685 A.2d 258, 267 (R.I.1996)). "Rule 702 permits a witness who is qualified 'by knowledge, skill, experience, training, or education' to testify as an expert." *Id.* "Prior to the admission of expert testimony, a trial justice must consider whether the testimony sought is relevant, within the witness's expertise, and based on an adequate factual foundation." *Id.* (quoting *Rodriquez v. Kennedy*, 706 A.2d 922, 924 (R.I.1998) (per curiam)). "As a rule of thumb, expert testimony should be permitted on nearly every subject so long as it is beyond the understanding of laypersons of ordinary intelligence." *State v. Lyons*, 725 A.2d 271, 274 (R.I.1999) (citing *State v. Bryant*, 670 A.2d 776, 782 (R.I.1996)).

Our review of the record indicates that even if the defendant had objected, the trial justice would not have abused his discretion in admitting the disputed testimony. At trial, Officer Badessa testified that he had been a member of the Providence Police Department for twenty-five years, and of that, he had spent the previous seven years as a member of the BCI unit. During the latter period, he handled approximately thirty homicides, had training with respect to bullet holes and impact, and had experience in the testing of gunshot residue on clothing. In addition, his testimony was limited to the general characteristics of clothing that has been exposed to gunshot residue evidence. At no point did he form an opinion about the actual clothing that the defendant was wearing on the night of the murder.[6] Furthermore, in light of the fact that Prof. Dennis C. Hilliard, the director of the state crime laboratory and a prominent and acknowledged expert in forensic laboratory testing, had testified without objection about the same opinion evidence, namely, the dissipation of gunshot residue from articles of clothing, even if the admission of Officer Badessa's opinion testimony had been error, it would be harmless error beyond any reasonable doubt since the same opinion evidence also had been presented to the jury by Professor Hilliard and without any objection by defense counsel.

## V

### The Rule 404(b) Challenge

At trial, the state presented the testimony of Ralph Mosley (Mosley), a former prison cellmate of Gomes while Gomes was incarcerated and awaiting trial. During Mosley's testimony, the following colloquy took place:

"Q. * * * Do you recall him indicating-talking about any of his cousins?

"A. Yes.

"Q. Did he use any names then?

"A. Yes.

" * * *

"Q. And, what did he indicate to you concerning his cousin Ray?

---

6. The trial justice sustained defense objections to Badessa's references to gun powder residue on the defendant because the prosecutor failed to provide a proper foundation for that information during the direct examination of Badessa.

"A. That they were all pretty close, and they were all good boosters.

"THE COURT: All good what?

"A. Boosters.

"Q. And do you know what that phrase 'boosters' means?

"A. Yes, sir.

"Q. What is that?

"MR. CORLEY: Objection.

"THE COURT: You may answer.

"A. Thieves."

Immediately thereafter, the defendant failed to move to strike the challenged testimony and did not request either a curative instruction from the trial justice and/or move to pass the case. He asserts that:

"the introduction of the testimony that the defendant's cousins were 'boosters' which the Court allowed along with its definition as referring to 'thieves' was error pursuant to Rule 404(b) of the Rhode Island Rules of Evidence."

He contends that Mosley's testimony was both prejudicial and irrelevant. Specifically, Gomes asserts that the challenged testimony went directly to his character and was without any probative value. Assuming that this issue had been raised below, we conclude that the defendant's contentions are unpersuasive.

■■■ Only if evidence of prior criminal acts is both prejudicial and irrelevant is it inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence. *See State v. Garcia*, 743 A.2d 1038, 1050 (R.I. 2000). "[Q]uestions of relevancy of evidence, including whether the probative value of proffered testimony is outweighed by the danger of undue prejudice, are left to the sound discretion of the trial justice." *Id.* (quoting *State v. Gordon*, 508 A.2d 1339, 1347 (R.I.1986)). A trial justice's decision concerning relevancy will not be disturbed on appeal unless that determination was both a prejudicial "abuse of discretion *and* if the admission of the irrelevant evidence was prejudicial to the rights of the accused." *State v. Robertson*, 740

A.2d 330, 335 (R.I.1999); *see also Garcia*, 743 A.2d at 1050.

After reviewing the facts of this case, we conclude that the trial justice reasonably could have determined that because the term "boosters" already had been put before the jury without objection, an explanation of that term would be of assistance to the jury. Even if we were to agree that the above questions were irrelevant and unnecessary and that the trial justice abused his discretion by permitting the questions to be asked, that determination would not be sufficient to constitute reversible error because the answers as given did not serve to prejudice the defendant. *See Robertson*, 740 A.2d at 336.

■■■ "When a defendant objects to a remark as prejudicial, the trial justice is obliged to evaluate the potential prejudice of the statement or question on the outcome of the case by examining the statement in its factual context." *State v. Fernandes*, 526 A.2d 495, 498 (R.I.1987) (citing *State v. Collazo*, 446 A.2d 1006 (R.I.1982)). "[P]rejudice exists when the challenged comment or question 'so inflames the passions of the jury as to prevent their calm and dispassionate examination of the evidence.'" *Id.* (quoting *State v. Brown*, 522 A.2d 208, 211 (R.I.1987)). "This Court has held that in order to show prejudice, a reasonable possibility must exist that the improper evidence contributed to a defendant's conviction." *Robertson*, 740 A.2d at 336 (citing *State v. Gallagher*, 654 A.2d 1206, 1211 (R.I.1995)). "In order to determine whether this reasonable possibility exists, we must decide what probable impact the improper evidence would have had on an average jury." *Id.* (citing *State v. Burke*, 427 A.2d 1302, 1304 (R.I.1981)). "Then, we assume that the improper evidence had the same impact on the jury in the case at bar." *Id.* The admission of objectionable evidence is "harmless if we determine that it is not reasonably possible that such evidence would influence an average jury on the ultimate issue of guilt or

innocence." *State v. Burns,* 524 A.2d 564, 568 (R.I.1987) (quoting *State v. Poulin,* 415 A.2d 1307, 1311 (R.I.1980)).

■ Having reviewed the entire record of this case, we conclude that there is no reasonable possibility that the testimony now being challenged contributed to the defendant's convictions. In the first place, it is not clear that the challenged testimony even referred to the defendant. When Mosley testified that "they were all good boosters" he did not specifically include the defendant as being a member of that group; indeed, the reference was made only in response to a series of questions about the defendant's cousins. Secondly, "[t]his Court has previously held that the admission of impermissible evidence need not be prejudicial in a case in which there is independent overwhelming evidence of a defendant's guilt." *Robertson,* 740 A.2d at 337.

In this case, an eyewitness had identified the defendant as being at the scene only seconds before the gunshots; within ten to fifteen minutes of the murder and within only a few blocks of the scene, the defendant was discovered to be in possession of the actual murder weapon; and, the defendant confessed to Mosley that the murder was both a "sanctioned hit," and that he went to the door to draw the victim out of the house. Consequently, even if it was error to admit the general reference to the term "boosters" and its subsequent explanation as relating to "thieves," we conclude that its admission was harmless beyond any reasonable doubt.

## VI

### The Leading Questions

■ At the conclusion of the defendant's cross-examination of Mosley, the state asked Mosley a number of questions during redirect examination. The defendant asserts that these questions were leading and that the trial justice erred in admitting them over his objection.

■ "A leading question is most generally defined as a question that suggests the desired answer." *State v. Girouard,* 561 A.2d 882, 888 (R.I.1989) (citing *Urbani v. Razza,* 103 R.I. 445, 448, 238 A.2d 383, 385 (1968)). "While it is true that as a general rule leading questions are prohibited on direct examination, a trial justice has considerable latitude in sustaining or overruling objections to leading questions." *Id.* "As the admission of leading questions is within the discretion of the trial justice, his or her ruling upon this matter will be overturned only upon an abuse of discretion or where there is substantial injury to the defendant." *Id.*

In the instant case, during its redirect examination of Mosley, the state asked a series of questions to which the defendant objected. After allowing six of these questions, the trial justice interrupted the state's line of questioning, stating that "we're not going to rehash everything on direct." Although the questions propounded by the state's prosecutor clearly were leading and improper, the facts elicited by those questions already were in evidence from Mosley's earlier testimony during direct examination. Thus, given that the questions amounted to a reiteration of testimony already in evidence and that the trial justice did caution the prosecutor, "there was no substantial injury to defendant from the question[s] and the trial justice did not abuse his discretion in overruling the objection[s] to [them]." *Girouard,* 561 A.2d at 888.

■ We reiterate, however, the clear and still-prevailing rule that the purpose of redirect examination is to clarify matters that are brought out or raised for the first time on cross-examination, and is not intended to permit a prosecutor to rehash the witness's direct examination and get in the last word. *See State v. Studley,* 671 A.2d 1230, 1231 (R.I.1996) (per curiam) (reiterating that "the scope of redirect examination is limited to matters testified to on cross-examination"). Our last words to the wise, we trust, will not go unheeded.

## VII

### Conclusion

For the foregoing reasons, the defendant's appeal is denied and dismissed. The judgments of conviction are affirmed and the papers in this case are remanded to the Superior Court.