**[J-6-2021] [MO: Mundy, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

|  |  |  |
|---|---|---|
| IN THE INTEREST OF: T.W., A MINOR | : | No. 22 EAP 2020 |
| APPEAL OF : T.W. | : | |
| | : | Appeal from the Judgment of |
| | : | Superior Court entered on February |
| | : | 4, 2020 at No. 2390 EDA 2018 |
| | : | affirming the Order entered on July |
| | : | 10, 2018 in the Court of Common |
| | : | Pleas of Philadelphia County, |
| | : | Juvenile Division, at No. CP-51-JV- |
| | : | 0001105-2018. |
| | : | |
| | : | ARGUED:  March 9, 2021 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                    **DECIDED:  October 20, 2021**

This case requires us to delineate the quantum of suspicion that a police officer initiating a protective search pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), must possess before he expands the scope of that search from a pat-down to the more intrusive act of reaching inside a suspect's clothing.  *Terry* did not specify whether an officer must have probable cause or, alternatively, only reasonable suspicion to believe that an object felt during a pat-down is a weapon before the officer reaches inside a suspect's clothing and removes that object.  In resolving that open question, the Majority concludes that "a police officer may remove an object from within a suspect's clothing under the reasonable suspicion that the object is a weapon."[1]  On this broad and important holding, my views align with those of the Majority.

---

[1]    Maj. Op. at 17.

I part ways with the Majority in its application of the reasonable suspicion standard to this case. In my view, the Majority errs in concluding that Officer Nicholas Grant reasonably believed that the object in T.W.'s pocket was a weapon. The only additional information that Officer Grant acquired during the frisk—the lone fact that, according to the Majority, empowered him to reach inside T.W.'s clothing—was the presence of a "hard object,"[2] without more. Disregarding the not insignificant likelihood that any given "hard object" might be a great many things other than a weapon, the Majority approves the intrusion because to do otherwise "would require police officers to allow suspicious objects to remain on a suspect's person during a stop, which could potentially be used to harm police officers or the general public."[3]

The Majority posits a false dilemma. When a pat-down reveals a hard object, the officer is not forced to choose only between (a) risking his (or others') safety; and (b) reaching inside the suspect's clothing. A third choice is available. The police officer can discern whether the hard object is dangerous through a less invasive option: manipulating the object from outside the clothing. *Terry*, as further developed by its progeny, requires police officers to use the least intrusive means reasonably available during a protective search. Given the decidedly limited support for any belief that T.W. possessed a weapon here, prevailing Fourth Amendment law required Officer Grant to manipulate the unknown object before reaching into the interior of T.W.'s pocket.

By failing to require police officers to employ the least invasive method of searching for weapons, the Majority sanctions substantial intrusions upon persons whenever a police officer detects any object that conceivably or theoretically could present a danger, no matter how unlikely it is that the object presents a real and actual threat. To permit

---

[2]     *Id*. at 3.

[3]     *Id*. at 16.

intrusion into a suspect's clothing on such scant indicia is to remove all meaningful limitation on the breadth of the protective search. The privacy interests secured by the Fourth Amendment require more than a vague hunch that an unidentified object might be a weapon in order to justify a warrantless search of a suspect's person. This is particularly so in light of the availability of external manipulation as an alternative.

## I. Background

At approximately 4:15 a.m. on June 19, 2018, Officer Grant, a two-year veteran of the Philadelphia Police Department, and his partner, Officer Robert Heeney, were on routine patrol of the 2200 block of North 20th Street in Philadelphia when they observed two vehicles, a silver Toyota and a green Chevrolet, make the same illegal U-turn. When the officers attempted to follow in order to initiate simultaneous traffic stops, the vehicles accelerated and sped through several red lights. The Chevrolet struck several cars and crashed. Two men alighted from the vehicle and fled. The police officers exited their patrol car and chased the two men on foot. During that ultimately unsuccessful pursuit, Officers Grant and Heeney saw the Toyota stopped at a red light. Still on foot, the officers conducted a vehicle stop of the Toyota. Notes of Testimony ("N.T."), 7/10/2018, at 8-12.

Three people were inside the Toyota: a female driver, a female front-seat passenger, and seventeen-year-old T.W., who was sitting directly behind the driver. Upon approaching the vehicle, Officer Grant witnessed T.W. reach into his pockets while "blad[ing] his body"—*i.e.*, turning his left shoulder away from Officer Grant to block his view. *Id.* at 13-14. Officer Grant ordered T.W. to stop moving, but T.W. did not comply. *Id.* at 15-16. Concerned that T.W. "could have had a weapon [or] narcotics," Officer Grant directed T.W. to exit the vehicle. *Id.* at 14.

Once T.W. stepped out of the vehicle, Officer Grant conducted "an open-hand pat down" of the outside of T.W.'s clothing. *Id.* at 16. While patting down the left pocket of

T.W.'s pants, Officer Grant felt a "[h]ard" object. *Id.* at 17. Unable to determine what the object was, Officer Grant reached into T.W.'s pocket and removed the object. Upon closer inspection, Officer Grant determined that the item was a medicine bottle labeled "Promethazine," which contained a liquid. *Id.* at 18. Officer Grant learned that the bottle was not prescribed to T.W., who was unable to produce identification. *Id.* Suspecting that promethazine was a controlled substance, Officer Grant arrested T.W. Officer Grant conducted a search incident to the arrest, during which he reached into T.W.'s right pants pocket and recovered a prescription pill bottle (also prescribed to a person other than T.W.) containing two white pills, later identified as oxycodone, a known controlled substance. *Id.* at 18-20. No weapon was retrieved. *See id.*

The Commonwealth filed a juvenile delinquency petition against T.W., charging him with possession of a controlled substance. T.W. moved to suppress the items of physical evidence recovered from his person as fruits of an unlawful search. The Court of Common Pleas conducted a suppression hearing, at which Officer Grant testified to the facts recited above. Other than recalling that the object in T.W.'s pocket was "large" and "hard," Officer Grant provided no additional description. *Id.* at 18. Nor did he state that he believed that the object was a weapon. Instead, several times throughout the hearing, Officer Grant testified candidly that he was unable to identify the object. *See id.* at 14 ("He could have had a weapon. He could have narcotics. I wasn't really sure. It's a high crime area."); *id.* at 17 ("I felt a large object in his left pants pocket. . . . I wasn't sure what it was. But it was large, so I felt the need to take it out."); *id.* at 26 ("I did not know what it was."). During cross-examination, Officer Grant could not remember the "exact size" of the bottle, though defense counsel, referencing the property receipt that Officer Grant filled out following the arrest, stated that it was a "seven-milligram bottle," approximately "two to three inches in height." *Id.* at 20-21 (referencing Commonwealth's

Exhibit 1-C, Property Receipt No. 3345946).[4]  Officer Grant agreed that the bottle of promethazine was comparable "to a bottle of cough syrup," or "Nyquil"—and that its presence was the "sole reason" that he decided to reach inside to search T.W.'s front pants pocket. *Id.* at 21.

At the conclusion of the suppression hearing, the court rendered findings of fact and denied T.W.'s motion.  The parties proceeded immediately to trial and incorporated the suppression testimony by reference.  Contrary to Officer Grant's suspicion and the trial court's apparent factual finding at the suppression hearing, the Commonwealth, at trial, conceded that the bottle of promethazine did not contain any "commonly encountered controlled substance."  *Id.* at 37 (citing Commonwealth's Exhibit 1-A, Seizure Analysis).[5]  In light of T.W.'s possession of oxycodone, however, the court adjudicated him delinquent and ordered that he be placed in a residential facility.

T.W. appealed.  He argued, in relevant part, that the trial court erred in denying his suppression motion because Officer Grant exceeded the scope of a *Terry* search by reaching into his pocket without probable cause and removing the  bottle of cough syrup.

---

[4]    Property Receipt No. 3345946 contradicts Officer Grant's testimony that he pulled the bottle of oxycodone from T.W.'s right pants pocket.  According to the property receipt, Officer Grant seized both the promethazine and the oxycodone from the left pocket of T.W.'s pants.  *See* Commonwealth's Exhibit 1-C, Property Receipt No. 3345946.

[5]    As the trial court later acknowledged, promethazine is not a controlled substance. Trial Court Opinion ("TCO"), 10/10/2018, at 3 n.1.  The court explained that it initially found that the seized liquid was a controlled substance because no party objected to Officer Grant's testimony on that issue.  The court noted that promethazine is commonly mixed with "limited amounts of codeine," which is a controlled substance.  *Id.*  Typically, the promethazine and codeine mixture is put into Sprite, along with Jolly Ranchers.  *See Lean (Drug)*, WIKIPEDIA, THE FREE ENCYCLOPEDIA, http:// en.wikipedia.org/wiki/ Lean_(drug)#Names (last visited June 16, 2021).  This recreational drug beverage, which was popularized by musicians from Houston, Texas, goes by several names:  lean, purple drank, sizzurp, dirty Sprite, and Texas tea.  *Id.*  The drink is so deeply embedded in Houston's hip-hop scene that local artists developed a sub-genre of hip-hop inspired by it, called Chopped-N-Screwed, in which the musicians distort the music by slowing it down and skipping beats, thereby imitating the intoxicating effects of the mixture.  *See id.*

In its Pa.R.A.P. 1925(a) opinion, the trial court recognized that the sole issue was whether Officer Grant exceeded the permissible scope of the *Terry* search by reaching into T.W.'s pocket. The court found that "[i]t was reasonable for Officer Grant to go into [T.W.'s] pockets to dispel a reasonable fear for his safety and the safety of others during the investigatory stop." TCO at 4. To justify its reasonableness determination, the court relied upon the same circumstances that it found adequate to support the initial pat-down, with the lone additional fact that Officer Grant felt a hard object. In particular, the court opined:

> [T.W.] was a passenger in a vehicle that was just in a high[-]speed chase with police at 4:15 in the morning in a high crime area where Officer Grant has a plethora of personal experience with weapons recovered from traffic stops. Moreover, the officers made the stop without the benefit of a police vehicle. [T.W.] did not comply with Officer Grant's order to stop hiding his body and reaching into his pockets. It was only after a limited the [*sic*] search of the outside of [T.W.'s] clothes and feeling a hard object that was not readily identifiable that Officer Grant expanded his search to the inside of that particular pocket. Looking at the totality of the circumstances, Officer Grant had a reasonable suspicion, based on specific and articulable facts, that [T.W.] may be armed and dangerous, and Officer Grant tailored his search to only that which was reasonably necessary for the discovery of weapons.

*Id.* at 4-5 (record citations omitted).

In other words, the trial court concluded that, because the pat-down was supported by a reasonable suspicion that T.W. possessed a weapon, and because the pat-down did not fully alleviate Officer Grant's suspicion, Officer Grant was justified in reaching into T.W.'s pocket and removing whatever he found in order to satisfy his general safety concerns. By that logic, the reasonable suspicion necessary for a "limited" protective frisk suffices as well to permit a police officer to reach inside any clothing provided that he feels any "hard" object, no matter how slight the probability that the object is a weapon. This rationale, which the Majority endorses wholeheartedly, eviscerates the limited exception to the warrant requirement engendered in *Terry* and developed further by its

progeny. Because allowing such an expansion of the *Terry* exception swallows the warrant rule and facilitates overreach by law enforcement, I cannot join the Majority's opinion.

## II. *Terry* and its Progeny

In light of the Majority's expansive gloss, a review of *Terry* is in order. That seminal case began when Detective Martin McFadden of the Cleveland, Ohio Police Department observed John Terry and Richard Chilton engaging in an "elaborately casual and oft-repeated reconnaissance of" a store, a circumstance that led the detective to conclude that the men were preparing to burglarize the establishment. *Terry*, 392 U.S. at 6. Based upon his thirty years of investigating shoplifters and pickpockets, Detective McFadden suspected that the men could be carrying guns. *Id.* When he approached Terry and Chilton and asked for their names, they did not respond. *Id.* at 6-7. Although he lacked probable cause to believe that Terry was carrying a firearm or planning to commit a crime, Detective McFadden "grabbed" Terry and "patt[ed] down the outside of his clothing." *Id.* at 7. He "felt a pistol" in the pocket of Terry's overcoat and reached inside, but he could not remove the gun. *Id.* Consequently, Detective McFadden removed Terry's coat and proceeded to retrieve the pistol. He then frisked Chilton's outer clothing, discovered a revolver in Chilton's coat pocket, and seized it. *Id.*

Terry and Chilton were charged with possession of a concealed weapon. *Id.* at 6. At a suppression hearing, Detective McFadden "testified that he only patted the men down to see whether they had weapons, and that he did not put his hands beneath the outer garments of either Terry or Chilton until he felt their guns." *Id.* at 7. The men were convicted, and ultimately Terry appealed to the Supreme Court of the United States.

In addressing the legality of Detective McFadden's conduct, the Supreme Court balanced the competing governmental and individual interests at issue. On the one hand,

the Court recognized that even a protective search is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Id.* at 25. Indeed, the Court characterized such an intrusion as an "annoying, frightening, and perhaps humiliating experience." *Id.* But the Court then explained that the individual's interest in personal security was opposed to "the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Id.* at 23. The Court held that the latter interest carried the day, stating, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Id.* at 24.

Given the weighty and pressing state interest in officer safety, the *Terry* Court determined that the traditional calculus of probable cause was ill-suited to the circumstances before it. Thus, the Court devised a new, lesser standard of proof, which permits a protective search when an officer has a reasonable suspicion, based upon "specific and articulable facts," that the detainee is "armed and dangerous." *Id.* at 21, 27. When that standard of proof is satisfied, a "carefully limited search of the outer clothing of such persons . . . is a reasonable search under the Fourth Amendment." *Id.* at 30-31. The Court concluded that Detective McFadden's search of Terry satisfied those requirements. *Id.* at 31.

The *Terry* Court underscored that the scope of the search is just "as vital a part of the inquiry" as the issue of whether the search is warranted at all. *Id.* at 28. But the Court declined to articulate the specific "limitations which the Fourth Amendment places upon a protective seizure and search for weapons," opining only that it must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* Rather than establish a bright-line

rule, the Court concluded that the permissible scope of a protective search is context-dependent, and must "be developed in the concrete factual circumstances of individual cases." *Id.*

It is beyond cavil that *Terry* allows a police officer who possesses specific and articulable facts that a suspect is armed and dangerous to conduct a frisk of that person and to remove any objects that the officer identifies as weapons. And *Terry* provides unambiguously that, in assessing whether a reasonable suspicion exists, "it is imperative that the facts be judged against an objective standard." *Id.* at 21. Thus, "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent" of the law enforcement officer. *Whren v. United States*, 517 U.S. 806, 814 (1996). As such, whether a police officer's conduct was unreasonable "turns on an objective assessment of [the officer's] actions in light of the facts and circumstances confronting him at the time." *Scott v. United States*, 436 U.S. 128, 136 (1978). The officer's actual belief is legally irrelevant; courts must focus instead upon whether the circumstances that predicated the protective search would lead a reasonable and similarly-situated police officer to conclude that the suspect was armed and dangerous.

While certain aspects of *Terry* are clear, the High Court provided no meaningful guidance on two vital questions that persist in any protective search inquiry, making the task of defining the scope in some individual cases exceedingly difficult. First, the *Terry* Court did not articulate whether a police officer conducting a protective search must utilize the least intrusive means reasonably available to the officer. The *Terry* Court stated only that "Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons." *Terry*, 392 U.S. at 30. The Court expressed its broad objective of affording law

enforcement "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24.

Second, *Terry* does not establish the requisite level of suspicion that a police officer must possess in order to escalate a pat-down to a more intrusive search. The *Terry* Court emphasized that, after patting down the suspects, Detective McFadden "did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons." *Id.* at 29-30. Because Officer McFadden was certain that the object he felt was a weapon, it is fair to conclude from *Terry* that an investigating officer must definitively know that the object is a weapon before removing it from the suspect's person. But, as today's Majority observes, making certainty a prerequisite to further exploration also seems to conflict with *Terry's* broad concern for officer safety. In many encounters, a pat-down may not produce a sufficient tactile impression to allow determination of an object's character. For example, if a suspect is wearing bulky clothing, it might well be difficult to discern whether the object within is a weapon based upon an open-handed frisk alone.

The issue presented in today's case calls upon this Court to define the scope of a protective search, which in turn requires a serious examination of *Terry's* open questions. While *Terry* itself left the bounds of a protective search nebulous, decisions applying *Terry* provide some grounds for demarcation. In the companion case to *Terry*—*Sibron v. New York*, 392 U.S. 40 (1968)—the Supreme Court offered some clarity on the first question that *Terry* left unanswered. There,[6] Officer Anthony Martin ("Patrolman Martin") observed

---

[6] *Sibron* addressed two cases that the Court had consolidated for argument. *Sibron*, 392 U.S. at 44. The lead case involved Nelson Sibron, who was convicted of possessing heroin. *See id.* at 44-47. The other case concerned John Francis Peters, who was subjected to a search incident to arrest based upon probable cause that Peters was planning to commit a robbery. *See id.* at 66-68. Consequently, the Court's assessment of the search of Peters neither concerns the scope of a protective search nor informs the analysis here.

Nelson Sibron "in conversation with six or eight persons whom Patrolman Martin knew from past experience to be narcotics addicts." *Id.* at 45. During Patrolman Martin's eight-hour surveillance of Sibron, "he did not overhear any of these conversations," nor did he "see anything pass between Sibron and any of the others." *Id.* Nevertheless, Patrolman Martin confronted Sibron and told him, "You know what I am after." Sibron then "mumbled something and reached into his pocket." *Id.* at 45. Patrolman Martin simultaneously "thrust his hand into the same pocket" and removed several glassine envelopes containing heroin. *Id.* Sibron was arrested and ultimately convicted of a narcotics possession offense. *Id.* at 44.

On appeal, the Supreme Court of the United States, noting that Patrolman Martin lacked probable cause to arrest Sibron, explained that the "seizure and search of Sibron might still have been justified at the outset if he had reasonable grounds to believe that Sibron was armed and dangerous." *Id.* at 63. In concluding that Patrolman Martin lacked the requisite quantum of suspicion, the Court explained that, during the suppression hearing, the officer presented no "facts from which he [could have] reasonably inferred that [Sibron] was armed and dangerous." *Id.* at 64.

But the Court did not stop there. The Court further held that, even assuming "that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible." *Id.* at 65. To that end, the Court explained:

> The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, *with no attempt at an initial limited exploration for arms*, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin.

*Id.* (emphasis added). Because nothing prevented Patrolman Martin from first frisking Sibron, the Court held that "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.* Accordingly, the Court held that the search of Sibron was unlawful, and that the "heroin was unconstitutionally admitted in evidence against" him. *Id.* at 68.

*Sibron* confirms that concerns for officer safety cannot justify a greater intrusion into a constitutionally protected area than the circumstances warrant. *Terry* cited *Sibron* as a case that develops "the limitations which the Fourth Amendment places upon a protective seizure and search for weapons." *See Terry,* 392 U.S. at 29. Generally, in accord with *Sibron*, a police officer must employ the least intrusive means reasonably available to determine whether the suspect is armed. The "limited nature of the intrusion" is essential to the constitutional validity of a *Terry* stop and search. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975) ("*Because of the limited nature of the intrusion*, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest.") (emphasis added). The use of the least intrusive measures reasonably available is "the predicate" that permits searches "on suspicion short of probable cause." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality); *id.* ("The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."); *see also United States v. Place*, 462 U.S. 696, 703 (1983) ("When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.").

The search must be proportional to the circumstances that induced it, escalating to a more intrusive search only when the circumstances reasonably warrant a more

substantial intrusion. Without that limitation, there is a "danger" that police "officers will enlarge a specific authorization, furnished by" safety concerns, "into the equivalent of a general warrant to rummage and seize at will." *Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring).[7] Accordingly, "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *see also Commonwealth v. Stevenson*, 744 A.2d 1261, 1264 (Pa. 2000) (explaining that "a protective search must be strictly 'limited to that which is necessary for the discovery of weapons'") (quoting *Terry*, 392 U.S. at 26); *Commonwealth v. Lovette*, 450 A.2d 975, 980 (Pa. 1982) (encouraging strict adherence to *Terry* and disapproving unnecessary police conduct that "increased the intrusiveness of the encounter").

When conducting a safety search, does an officer have options that go beyond an open-handed pat-down of the exterior of the suspect's clothing but that fall short of reaching into the suspect's pocket? Does a police officer who detects an object during a frisk but who lacks a sufficient basis to determine that the object is a weapon face only a starkly binary choice: risk his safety or invade the suspect's person by reaching inside his clothing? Unlike the Majority and the Concurrence, I conclude that applicable precedents indeed provide a middle ground.

*Dickerson* is instructive. In that case, a police officer frisked a man after observing the man's seemingly evasive conduct upon departing "a building known for cocaine traffic." *Dickerson*, 508 U.S. at 369. During the ensuing pat-down, the officer felt a small lump and determined that it was not a weapon. *Id.* Despite concluding that the object

---

[7] *Brown* concerned the "plain view" doctrine, not the scope of a *Terry* search *per se*. *Brown*, 460 U.S. at 735.

was not a weapon, the officer proceeded to manipulate the lump in order to determine whether it was cocaine.

On appeal, the Supreme Court held that, "if a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity [as contraband] immediately apparent, . . . its warrantless seizure would be justified." *Dickerson*, 508 U.S. at 375-76. That rule, which has been dubbed the "plain feel" doctrine,[8] is what gives *Dickerson* its status as a landmark decision. Relevant for present purposes, the Court also held that the manipulation of an object constituted "a further search" that was not categorically within the scope of the initial, lawful frisk. *Id*. at 379. The Court explained that, "[a]lthough the officer was lawfully in a position to feel the lump in [Dickerson's] pocket," the officer exceeded the scope of a *Terry* search by manipulating the object once he determined that it was not a weapon. *Id*. at 378-79. After the officer concluded that the object was not a weapon, no further manipulation was permissible.

*Dickerson* does not prevent an officer from manipulating an object in all circumstances. The manipulation in *Dickerson* was unlawful only because the officer already had concluded that the object was non-threatening. Had the officer not yet negated the presence of a weapon, the manipulation, consistent with *Terry*, would be within "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24; *see also United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) (holding that, where an initial pat-down revealed a cylindrical object several inches long in a suspect's pocket, "a precautionary squeeze is well within the scope of *Terry*").

---

[8] As today's Majority aptly explains, the plain feel doctrine does not apply to this case because Officer Grant, unlike the officer in *Dickerson*, did not reach into T.W.'s pocket and seize the object under the belief that the object was contraband. *See* Maj. Op. at 15-17.

A police officer is not faced with a binary choice when the frisk reveals an object that is not readily identifiable as a weapon. In such circumstances, the officer has a third option: briefly manipulating the object from the outside of the individual's clothing in order to establish its tactile characteristics. External manipulation is a reasonable and minimally intrusive investigative measure that protects the suspect's interest in personal security while maintaining officer safety. Police officers are accustomed to performing this investigative measure.[9] Indeed, the Philadelphia Police Department's manual of

---

[9] The Concurrence disagrees that external manipulation is a viable alternative. In the Concurrence's view, the requirement that officers manipulate an unknown object "is problematic from both an officer and suspect/bystander safety perspective." Concurring Op. at 14 (Dougherty, J.). Respectfully, this concern is misplaced. When officers reach into suspects' clothing in order to seize objects, they also are required to "move, squeeze, or otherwise handle a potentially dangerous weapon they cannot see[.]" *Id.* Reaching into a suspect's clothing and grasping objects that could be "firearms without trigger guards or with modified trigger pull weight" also creates a risk of an officer "possibly mishandling a weapon hidden from view." *Id.* at 15. Yet police officers regularly and safely reach into suspects' garments and seize potential weapons. If police officers are capable of safely performing the arguably more dangerous act of grasping and removing objects that they cannot see, they undoubtedly have the capacity as well to manipulate objects briefly from outside suspects' clothing without creating dangerous situations.

In the Concurrence's view, the reach into the suspect's clothing is the safest option available to the officer because an "officer reaching into a suspect's pocket to touch the object in question can immediately perceive the object's material . . . or other feature that would aid in identifying whether it is a weapon and its position." *Id.* at 15 n.6. I disagree. A police officer cannot acquire such features without first wriggling through the suspect's clothing, inevitably causing the object contained therein to move, and then grasping an unknown portion of the object. If an officer knows only that the object is hard and does not first manipulate the item, the officer could grasp a sharp blade, an unguarded trigger, or some other dangerous feature of the object. Conversely, if an officer manipulates the object before performing the blind reach into the suspect's clothing, the officer can acquire features of the object that can assist him in removing the object safely. For example, if an officer manipulates a hard object in a suspect's pocket and feels a pointed tip near the opening of the pocket or feels an L-shaped object, the officer can employ that additional information to reach into the suspect's pocket and grasp a portion of the object in a way that reduces the possibility of an injury. I fail to see how it is any safer for an officer blindly to reach into a pocket and squeeze an unknown portion of an unknown object than it is

directives provides the following instruction regarding a search incident to arrest: "The search can consist of . . . the grabbing, squeezing or sliding of hands over the remaining clothing to detect a weapon or contraband." Phila. Police Department Directive 5.7 § 21(H)(1)(a).[10]

Therefore, based upon the unique circumstances of a given case, a *Terry* search can encompass three permissible intrusions: (1) the protective frisk itself, (2) the manipulation of an object felt during the pat-down, and (3) the reach into the clothing. Those three means of searching a suspect lie on a continuum of increasing invasiveness. *Dickerson* provides that manipulation is a more intrusive act than simply patting the individual down and thus generally requires facts indicating the presence of a weapon beyond those facts that justified the initial pat-down. The intrusion into an individual's clothing in order to remove an object is more intrusive than frisking the person and also more intrusive than manipulating the object from the outside of the individual's clothing.

Generally, the police officer should commence the protective search through the least intrusive means reasonably available to him before that officer proceeds to a more intrusive search. Otherwise, the search would not be limited to what is necessary to accomplish its purpose under the circumstances. With this Fourth Amendment principle in mind, the question now becomes whether a set of circumstances sufficiently indicates

---

for an officer to manipulate an object gently from outside of the clothing, allowing him to reach into the suspect's clothing with more information than he would possess otherwise.

[10] https://www.phillypolice.com/assets/directives/D5.7-SearchWarrants.pdf (last visited Sept. 30, 2021). The Concurrence dismisses the Philadelphia Police Department's own procedures as pertaining to "Strip and Body Cavity Searches," as providing what officers "can" rather than "must" do, and as falling outside the certified record. *See* Concurring Op. at 14-15 n.5. These quibbles fail to dispel the manifest reality that external manipulation is available, practical, and in use on the street today.

the presence of a weapon such that a police officer can progress from a less intrusive search to a more intrusive one.

The sufficiency of the evidence supporting a given search or seizure is controlled by two broad, epistemic standards:  reasonable suspicion and probable cause.  Must a police officer have probable cause that an object which he feels during a frisk is a weapon before reaching inside the suspect's clothing, or is a mere reasonable suspicion enough? That question rests at the heart of this appeal.  The United States Supreme Court has distinguished the two standards of proof as follows:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

I agree with the Majority that a reasonable suspicion standard of proof controls throughout the duration of a *Terry* search.  The High Court's decision in *Adams v. Williams*, 407 U.S. 143 (1972), compels that conclusion.  There, a police officer patrolling alone at 2:15 a.m. received an uncorroborated tip from a known and reliable informant that Robert Williams was sitting in a car with narcotics on his person and "a gun at his waist."  *Id.* at 144-45.  The officer was within the high crime area where the informant told him that Williams was located, and the officer decided to investigate the tip.  The officer approached the car and ordered Williams to step out of the vehicle.  Williams refused and instead rolled down the window, placing the officer in a vulnerable position.  *Id.* at 145. Immediately thereafter, the officer reached through the window, placed his hand underneath the waistband of Williams' pants, where the informant stated that the weapon would be hidden, and removed a revolver.  *Id.*  Under those circumstances, the Supreme

Court held that the police officer's conduct was lawful. While emphasizing that the officer lacked probable cause that the suspect was armed, the Court held that "the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable." *Id.* at 148; *see id.* at 146-47 (explaining the lack of probable cause).

Although the act of reaching underneath the suspect's clothing was more intrusive than a mere pat-down, the *Williams* Court did not require a showing of probable cause that the suspect had a gun concealed within his waistband. The reasonableness of the officer's conduct, based upon the facts within his ken, determined its lawfulness. Because *Williams* applied a reasonable belief standard to the most intrusive aspect of a *Terry* protective search, it is logical to conclude that a reasonable belief standard governs until the officer's safety concerns are alleviated. And, by extension, the propriety of each of the three intrusions that could occur during a *Terry* protective search—frisk, tactile manipulation, and reaching into clothing—are assessed under this lesser standard of proof.

As the Concurrence aptly explains, "if an officer has reasonable suspicion to conduct a *Terry* frisk, that reasonable suspicion remains unless and until the officer's belief that the object may be a weapon is negated." Concurring Op. at 7. This principle does not furnish unbridled discretion to expand the scope of a validly initiated protective search. The search must be proportional to the circumstances that induced it, escalating to a more intrusive search only as the circumstances confronting the investigating officer necessitate a more substantial intrusion. The need to increase the intrusiveness of the search hinges upon the occurrence of one of two distinct conditions. First, an officer may expand the scope from a less invasive protective search to a more invasive one when the officer apprehends specific and articulable facts that demonstrate a need for more

intrusive conduct.[11] Put simply, as the reasonable belief that the suspect is armed waxes, the permissible scope of the protective search broadens as well. Second, the officer may expand the scope if the less intrusive option either is impractical under the circumstances or fails to negate a material possibility that the suspect is armed. *See United States v. Sharpe*, 470 U.S. 675, 687 (1985) ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.").

Both the Majority's and the Concurrence's reasonable suspicion analyses fail to limit the scope of the protective search to the least intrusive search reasonably available to the officer in light of the specific and articulable facts within the officer's knowledge. By contrast, the framework set forth below enforces the High Court's edicts, ensuring that the state and private interests implicated in a protective search maintain the balance that the Supreme Court struck in *Terry*.

### III. A Framework for Defining the Scope of a Protective Search

Generally speaking, a police officer who reasonably believes that a lawfully stopped individual is armed and dangerous should commence the protective search with a pat-down. When the officer performs an open-handed pat-down, the severity of the trespass is at its nadir. Thus, the quality and quantity of evidence required to yield a reasonable belief that the individual is armed and dangerous at that point is comparably low. Accordingly, the United States Supreme Court has indicated that, while certain evidence is insufficiently reliable to justify an initial stop, that same evidence may allow

---

[11]    The claim that additional facts can further fortify an officer's reasonable suspicion and thus authorize conduct that is more intrusive should not be viewed as controversial. If an officer conducts a pat-down and feels an object that shares characteristics with a weapon, the officer has acquired additional facts that create a stronger reasonable belief that the suspect is armed and dangerous than the officer possessed before performing the pat-down.

an officer who lawfully stops an individual to frisk the suspect. *Florida v. J.L.*, 529 U.S. 266, 274 (2000) (explaining that "the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with *Terry*, to conduct a protective search of a person who has already been legitimately stopped").

Given the minimal intrusion involved in a protective frisk, this Court has upheld a pat-down following a lawful stop based upon specific and articulable facts that, while consistent with possession of a weapon, were equally susceptible to a litany of "innocent" explanations. *Commonwealth v. Cook*, 735 A.2d 673, 676 (Pa. 1999). Thus, we have approved protective searches initiated based upon furtive movements, the nature of the suspected crime, and visual observations of bulges in the suspect's clothing. *See Commonwealth v. Zhahir*, 751 A.2d 1153, 1163 (Pa. 2000) (explaining valid reasons to frisk a suspect).

If the open-handed pat-down supplies tactile impressions that would lead a reasonable officer under the same circumstances to conclude that the object is not a weapon, then *Terry* forbids further intrusion; the officer may neither manipulate the object nor reach inside the individual's pocket. *See Dickerson*, 508 U.S. at 378-79. Thus, if the pat-down reveals the presence of an object that a reasonable officer would conclude is too soft, too small, or too irregularly shaped to be a typical weapon, the protective search, generally, must cease. *See Commonwealth v. E.M.*, 735 A.2d 654, 663 (Pa. 1999) (holding that the detection of a soft object during a frisk required termination of the protective search); *Commonwealth v. Wilson*, 927 A.2d 279, 286 (Pa. Super. 2007) (holding that a reasonable person would not "conclude that the physical sensation of touching a round cluster of 12 tiny knotted plastic baggie corners—which contained a net

weight of 1.743 grams of cocaine—could realistically produce the mental image or fear of a weapon").

Next, if, following the frisk, a reasonable officer would not yet negate the possibility that the object is a weapon, then the officer may manipulate the object from the outside of the suspect's clothing in order to identify additional palpable, tactile characteristics. In this interstice between a frisk and a reach into the suspect's clothing, the requisite strength of the specific and articulable facts indicating a weapon is at its midpoint, thus necessitating tangible characteristics that would inhibit a reasonable officer from concluding that the object is harmless. *Compare United States v. Miles*, 247 F.3d 1009, 1014 (9th Cir. 2001) (holding that an officer exceeded the permissible limits of a protective search by manipulating a box that "was no bigger than a large package of chewing gum and was one-half the size of a package of cigarettes"), *with Mattarolo*, 209 F.3d at 1158 (holding that a police officer who felt a cylindrical object several inches long in the defendant's pocket" acted within the scope of a *Terry* search by "pressing it between his thumb and forefinger in order to make sure" it was not a pocket knife). When the pat-down produces those kinds of articulable impressions, the officer may briefly "palpate the object" from the exterior of the clothing, going no further than is necessary to determine whether it is "a typical or obvious weapon." *State v. Black*, 721 A.2d 826, 831 (R.I. 1998).

Finally, if either the frisk or the subsequent manipulation reveals sufficient tangible qualities from which a reasonable officer would conclude that the object is a weapon, the officer may reach inside the suspect's clothing and remove the object. This is the most intrusive aspect of a protective search, generally demanding a demonstration of reasonable suspicion at its peak. A reasonable likelihood that the object is a weapon exists if it is hard, possesses spatial qualities of a typical weapon, and is located where one reasonably would carry such a weapon. *Compare United States v. Swann,* 149 F.3d

271, 276 (4th Cir. 1998) (holding that a police officer reasonably believed a "hard rectangular object" in the suspect's sock could have been a box cutter because of "[t]he location of the object, as well as its hard character and its shape. . . . A similarly shaped hard object in [the suspect's] pocket certainly would have raised no alarms, as there could be innumerable innocent explanations for it"), *with United States v. Campa*, 234 F.3d 733, 739 (1st Cir. 2000) (holding that removal of every "bulging" item detected during a pat-down was unlawful where the officer did not first "attempt to distinguish between" threatening and nonthreatening objects).[12] Stated differently, a reasonable officer would not conclude that an object that shares qualities with countless nonthreatening items presents a danger.

In applying this general framework, suppression courts must remain cognizant of several precepts underlying protective search jurisprudence. First, the *Terry* rule that an officer must employ the least intrusive means reasonably available generally requires an officer to acquire additional facts during the pat-down before manipulating the object and to obtain further facts during that manipulation before reaching into the suspect's clothing. Second, this general principle should not be viewed as a hard and fast line that requires police officers to gamble with their lives unnecessarily. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687. Hence, while the prosecution would be wise to substantiate or support each escalation of the search with discrete, articulable facts, a police officer's failure to proceed step-by-step in the moment

---

[12] In relying upon *Swann* to conclude that the reasonable suspicion standard applies, *see* Maj. Op. at 12, the Majority fails to recognize that the Court of Appeals found the *location* of the "hard rectangular object" to be essential to its finding of reasonable suspicion. *Swann*, 149 F.3d at 276. The *Swann* court underscored that "*a similarly shaped hard object in [the suspect's] pocket* certainly would have raised no alarms, as there could be *innumerable innocent explanation*s for it." *Id.* (emphasis added).

does not, standing alone, compel suppression. In some cases, for example, the evidence that warrants the investigatory stop may, by itself, warrant immediate intrusion into the suspect's clothing. With greater frequency, the pat-down alone might suffice to demonstrate that the object likely is a weapon, thus allowing intrusion into the suspect's clothing without first manipulating the object. Relatedly, certain circumstances will demonstrate that requiring a pat-down or manipulation before reaching into a suspect's clothing presents an unreasonable danger.[13] And there will be instances where manipulation of the object fails to produce sufficient tactile impressions to assure that the object is innocuous.[14] In such cases, reaching into the suspect's clothing is the least invasive option reasonably available to the officer in light of the facts within his ken.[15]

---

[13] *Cf. Williams*, 407 U.S. 143 (holding that the officer lawfully reached into the suspect's clothing without performing a pat-down where the suspect's failure to comply with the officer's command to exit the vehicle made it impossible for the officer to pat down the suspect without the officer placing himself in a more dangerous position); *Sharpe*, 470 U.S. at 686 (explaining that the assessment of whether officers pursued the least intrusive means reasonably available considers "whether the police are acting in a swiftly developing situation").

[14] The Concurrence reads the foregoing framework as "indulg[ing] in unrealistic second-guessing" because, in the Concurrence's view, police officers are incapable of safely manipulating objects through a suspect's clothing. *See* Concurring Op. at 13-16. As explained *supra*, it is common practice for police officers to employ external manipulation during a search incident to arrest. The safety concerns hypothesized by the Concurrence are unfounded. If the circumstances of an individual case demonstrate that it would be either dangerous or futile for an officer to manipulate a potential weapon, the foregoing framework does not require an officer to employ that investigative measure. The framework ensures that the failure initially to manipulate the object warrants suppression only when the officer acted unreasonably in failing to take that step. Here, the record does not suggest that requiring Officer Grant to first manipulate the object would have been either futile or dangerous.

[15] This nuance flows naturally from the Concurrence's cogent observation that the initial reasonable suspicion that a suspect is armed and dangerous exists until extinguished by facts that negate the reasonable possibility of a weapon.

Third, courts must scrutinize the type of potential weapons that a reasonable officer would conclude that the suspect possessed. In certain situations, a reasonable officer might conclude that, when a pat-down or manipulation reveals a small, thin, and hard object, the object is a weapon; a reasonable officer in different circumstances could conclude that those identical tactile impressions do not warrant the belief that the object poses a danger.[16]

Fourth, it bears repeating that the suppression court's review of a claim that a police officer exceeded the scope of a protective search does not encompass the officer's subjective conclusion that the object was or was not a particular weapon. The court considers only whether an objectively reasonable officer confronting the same

---

[16] Consider, by way of illustration, a Birmingham, U.K. police officer in the fictional world of the English television series "Peaky Blinders." The Peaky Blinders were members of an early-twentieth-century Birmingham criminal gang that concealed razor blades in the brims of their peaked hats. During violent confrontations with rival gangs or law enforcement, the Peaky Blinders would use their caps as weapons, slashing the eyes of their victims with the razor-blade-laden brims of their peaked caps (hence the titular name).

In this fictional scenario, the Birmingham police officer notices a man engaged in suspicious activity and lawfully conducts an investigative detention pursuant to *Terry*. The suspect has a distinctive Peaky Blinders' haircut, he is standing near a known Peaky Blinders' safe house, and he is wearing the gang's signature peaked cap. Reasonably believing the man might be armed, the officer pats down both the man and his hat. The officer feels a small, thin, and hard object in the cap. He removes the cap, looks inside, and notices a foil packet containing a thin layer of hash. Under these circumstances, the search of the hat was lawful, as it was substantially likely that the object in the hat was a razor blade.

Compare that hypothetical with the following scenario. In 2020, a Pittsburgh police officer observes a man wearing a peaked hat and engaging in suspicious activity. The officer conducts a valid *Terry* frisk and feels a small, hard object in the suspect's hat. The officer removes the cap, looks inside, and discovers a foil packet containing a thin layer of hash. But Pittsburgh does not have a gang akin to the Peaky Blinders. Consequently, the search of the hat would not be reasonable, but would instead be based upon rank speculation, rendering it beyond the scope of a lawful *Terry* search.

circumstances would remain suspicious that the item was a weapon capable of inflicting harm upon the officer or others nearby, and whether a reasonable officer would have employed a less intrusive investigative measure given the strength of that suspicion. The relevant circumstances are the tactile impressions, other developments that the officer perceived during the protective search, and the events that prompted that search. As in all cases, the facts known to the investigating officer, coupled with his training and experience, are critical.

Finally, the court must weigh the quantum and quality of the Commonwealth's evidence against the level of intrusion, mindful that greater intrusions generally call for stronger or more abundant evidence. In assessing the strength of the evidence, the suppression court should evaluate witness credibility[17] and the reasonableness of the assumptions relied upon by the officer in concluding that the suspect was armed. The court must consider whether the witness testified as to the size, density, material composition, shape, and location of the object. A trial court's finding that the officer's suspicions were reasonable is more likely to survive appellate review when the record contains credible testimony accounting for more of those descriptive features.

## IV. Application

Applying these principles to the circumstances of the present case yields the following assessment. In searching T.W. for weapons, Officer Grant was required to employ the least intrusive means reasonably available to him. If, and as, the circumstances amplified, or failed to negate, the likelihood that T.W. was armed and dangerous, the scope of the protective search expanded accordingly. Thus, the pertinent

---

[17] For instance, whether the alleged tactile impressions are consistent with the object actually seized bears upon the officer's credibility, as does the officer's training and experience. *See, e.g.*, *Wilson*, 927 A.2d at 286 (finding that the officer's belief that an object was a weapon was unreasonable because it was "not supported by the physical facts and characteristics of the evidence that was actually seized").

inquiry must weigh the facts that tended to show that T.W. possessed a weapon against those that countered that conclusion.

The facts that justified the initiation of the *Terry* stop and frisk, without more, did not support the more invasive protective search sanctioned by today's Majority. While the officers observed the vehicle driving erratically, reckless driving is not a crime inexorably associated with weapons.[18] What weapon must we associate with reckless driving? Perhaps the Majority and the Concurrence favor an inference that any motor vehicle violation creates a probability that an individual is armed. Even if the law supported such an unsound inference, it surely would not support the additional inference that T.W. also was armed, as he was not operating the vehicle. *Cf. Sibron*, 392 U.S. at 64 ("The suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime."); *Ybarra v. Illinois*, 444 U.S.

---

[18] For the view that reckless driving supports the inference that an individual is armed and dangerous, both the Majority and the Concurrence uncritically rely upon *In re O.J.*, 958 A.2d 561 (Pa. Super. 2008). There, the Superior Court held that a police officer reasonably believed that the suspect possessed a weapon because the "vehicular stop occurred at night," and the suspect "had been driving dangerously and initially refused to heed police efforts to stop his car." *Id.* at 566. The Majority and Concurrence would incorporate this non-binding holding into this Court's protective search jurisprudence despite the fact that the *O.J.* panel failed to articulate any support for the notion that erratic driving indicates that an individual is armed and dangerous. To make matters worse, the Majority and Concurrence would extend that unsupported inference to situations where the subject of the protective search was not the individual who was driving erratically. Our precedents do not ratify the supposition that one individual's dangerous acts can be attributed to another by mere association. In fact, this Court has expressly rejected such a proposition. *Commonwealth v. Grahame*, 7 A.3d 810, 817 (Pa. 2010) (holding that "a police officer must have a particularized, objective basis for a protective search; an individual's mere proximity to others engaged in criminal activity is insufficient"). While we here construe the evidence in the light most favorable to the Commonwealth, that obligation does not include grasping at straws and adopting dubious rules of law that are inconsistent with well-established legal precepts.

85, 91 (1979) (holding that "a person's mere propinquity to others independently suspected of criminal activity" did not authorize a protective search).

T.W.'s mere presence in a high crime area at night is a weak and non-particularized indicator that he was armed and dangerous. To be sure, reduced visibility can heighten the potential for dangerousness, but the Earth's rotation on its axis sheds no particular light on the likelihood that any given individual is armed. And it surely would be misguided for this Court to hold that the protection against unlawful searches and seizures is reduced for those individuals who happen to live in, or simply pass through, a high-crime area. Even when considered together, (1) low visibility, (2) being a passenger in a car that drove in a dangerous manner, and (3) presence in a high-crime area, do not create a reasonable belief that a passenger may be carrying a weapon. Those circumstances in tandem provided constitutional authority to commence a protective search only because T.W. also was "blading" his body—the lone individualized fact suggesting that T.W. could be armed and dangerous. Although this additional fact could support a suggestion that T.W. might be armed, it could support a contrary suggestion as well. After all, while T.W.'s movements were consistent with an attempt to conceal a weapon, they were equally, if not more, indicative of concealing nonthreatening contraband or an embarrassing item.

The facts that justified the pat-down did not alone warrant any more intrusive search. That conclusion is obvious when the present circumstances are compared with those at issue in *Williams*, *supra*. There, a police officer, who "was alone early in the morning on car patrol duty in a high-crime area," reached into the suspect's clothing after observing the suspect's furtive movements. *Williams*, 407 U.S. at 144. Although the officer did not first perform a pat-down, the *Williams* Court held that the more substantial intrusion was lawful at the outset because the officer was acting upon a reliable informant

tip that the suspect possessed a gun. *Id.* at 147-49. While both Officer Grant and the officer in *Williams* observed a suspect's furtive movements in a high-crime area at night, Officer Grant did not commence the protective search based upon similarly reliable, additional support for the belief that T.W. possessed a weapon. Thus, the lawfulness of Officer Grant's reaching into T.W.'s pocket turns upon whether the tactile impressions the officer gleaned from the frisk would have led a reasonable officer to conclude that the object was a weapon.

The palpable characteristics of record would not have led a reasonable officer to believe that the object in T.W.'s pocket was a weapon. Officer Grant testified that he felt a "large," "hard" object. The tactile features attested to by Officer Grant are not analogous to the informant tip in *Williams*, which carried enough evidentiary "value and reliability" that it was reasonable for the officer to reach into "the spot where the gun was thought to be hidden." *Id.* at 148-49. People (including juveniles such as T.W.) carry countless objects in their pockets that are hard and yet pose no threat to anyone's safety.[19] Officer Grant did not testify that the pat-down revealed the material composition, shape, or density of the object. While Officer Grant was not required to testify as to all those features with scientific certainty, he was required to offer something more than a vague assertion of a "large," "hard" object. Given that these were the only tangible qualities that Officer Grant could articulate, it is unsurprising that he repeatedly and candidly admitted at the suppression hearing that he did not know what the object was. N.T., 7/10/2018, at 14, 17, 26.

---

[19]     When frisking a random individual's pants, an officer might find a weapon. But he might just as likely find that the hard object he feels is a cellphone, a wallet, a key fob, a flask, an inhaler, an insulin pump, a bottle of hand sanitizer, a lighter, a hairbrush, a pack of cigarettes, a box of Tic Tacs, or a pedometer.

The reasonable belief that an object may or may not be a weapon is not a reasonable belief that the object is a weapon. The latter requires more than a trivial possibility; it requires that the totality of the circumstances causes a reasonable officer to conclude that the object likely was a weapon. Because Officer Grant detected only a tangible attribute that, under the circumstances, was more consistent with the many and sundry innocuous objects that people carry in their pockets, the possibility that the object was a weapon was small. Such a *de minimis* probability did not, without more, warrant an intrusion into T.W.'s pocket.

That said, the fact that the open-handed frisk revealed only a hard object did not require Officer Grant to terminate the search. When a pat-down reveals an object that shares characteristics with a weapon, a reasonable officer would not exclude the possibility that the object posed a realistic threat. Confronted with such circumstances, it would have been reasonable for Officer Grant briefly to manipulate the object from outside of T.W.'s clothing. Had the officer employed this less intrusive measure, he probably would have realized that the object was a bottle with a twist cap that posed no danger to him at all.

Officer Grant understood how to perform an external manipulation, as the Philadelphia Police Department's manual of directives instructs officers performing certain searches to proceed by "grabbing, squeezing or sliding of hands over the remaining clothing to detect a weapon."[20] "[A]ll personnel[, including Officer Grant,] are required to have a working knowledge of [the manual's] contents."[21] External manipulation is standard procedure that should not pose the safety concerns raised by

---

[20] Phila. Police Dep't Directive 5.7 § 21(H)(1)(a); *see also id.* § 21(H)(1)(c) (providing other instances where police officers are permitted to manipulate objects felt within a detainee's clothing).

[21] PHILA. POLICE DEP'T, http://www.phillypolice.com/accountability/index.html.

the Concurrence. And nothing about the situation at hand demonstrates that employing such an investigative measure would have created a dangerous situation in fact. Therefore, *Terry* and its progeny required Officer Grant to take that less intrusive step before reaching into T.W.'s pocket.[22] *See Sharpe*, 470 U.S. at 687 (providing that an officer's failure to employ a less intrusive measure warrants suppression if "the police acted unreasonably in failing to recognize or to pursue it"). Because the officer failed to do so, he exceeded the scope of the *Terry* search.

Today's Majority fails to acknowledge that Officer Grant could have manipulated the object before reaching into T.W.'s pocket. Utilizing the thinnest of evidence, the Majority instead endorses the utmost trespass upon the sanctity of one's person that a protective search implicates. In reaching the conclusion that a reasonable officer would believe the hard object presented a danger, the Majority relies exclusively upon the minimal, low-quality evidence that warranted the initiation of the protective search. *See* Maj. Op. at 20-21. As my colleagues recognize, the mere presence in a high-crime area is insufficient by itself to initiate even the minimally invasive pat-down. *Id.* at 20 n.5. The Majority nonetheless employs that non-particularized consideration to approve a far more intrusive search. T.W.'s suspicious movements and his noncompliance with Officer Grant's commands are the only particularized facts that the Majority cites. Those facts do not speak to the character of the object in T.W.'s pocket, and they are weak indicators of a weapon. For the Majority, the presence of a hard object will suffice, without more, to license a police officer to reach into a suspect's clothing during any validly initiated protective search. But that is no limitation at all. Most people carry some hard object on

---

[22] I also doubt that Officer Grant needed to remove the object from T.W.'s pocket in order to confirm that it was not a gun, knife, club, or other weapon. As soon as Officer Grant reached into the pants pocket and felt the bottle, it should have been readily identifiable as, in fact, a bottle.

their persons. The Majority has birthed the "hard object" exception to the warrant requirement, effectively holding that the Fourth Amendment permits all searches into a suspect's clothing as long as the protective search was initiated lawfully and the officer feels something that might share a "hardness" quality with some theoretical weapon. Because most people carry some hard object or item with a single weapon-like quality, the Majority's approach ensures that, in Pennsylvania, *Terry*'s limited exception effectively devours the Fourth Amendment's warrant rule.

While the Majority notes correctly that reasonable suspicion is a less demanding standard than probable cause,[23] this does not mean that the standard of proof is without teeth. The present matter requires this Court to ensure that the search of T.W. was "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 28. In defining the boundaries, *Terry* instructs courts to limit the search "strictly to what was minimally necessary to learn" whether the suspect was armed. *Id.* at 30. The Majority's approach abandons our obligation to uphold those mandates.[24]

---

[23]   *See* Maj. Op. at 19.

[24]   The Majority contends that T.W. has not preserved for our review the issue of whether the scope of the protective search must be limited to the least intrusive means reasonably available to the officer. *See* Maj. Op. at 221-22 n.8. I respectfully disagree. In order to preserve an issue for this Court's review, the party seeking resolution of the question must have raised it in the trial court and in the intermediate appellate court. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Issues, not specific arguments, must be preserved for appeal, and all arguments clearly implicated by the issues are subject to our review. *See HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 262 (Pa. 2019) (explaining that arguments that "merely strengthen[ a] previously articulated argument with additional legal authority" are not waived); *Arnold v. W.C.A.B.* (*Lacour Painting, Inc.*), 110 A.3d 1063, 1071 (Pa. Cmwlth. 2015) ("Our courts permit a litigant to make new arguments on appeal in support of a preserved issue."); *cf.* Pa.R.A.P. 2116(a) (providing that a "statement will be deemed to include every subsidiary question fairly comprised therein . . . or fairly suggested thereby"). In resolving the question presented and its logical

components, we are not limited to the answers supplied by the parties. This Court possesses the "authority to *sua sponte* address arguments which are clearly implicated in the cases before us." *Freed v. Geisinger Med. Ctr.*, 5 A.3d 212, 216 (Pa. 2010). Occasionally, we are required to address issues squarely encompassed by the question presented in fulfilling "this Court's function and responsibility to consider the broader picture, including the impact of precedent beyond the facts of an individual case, and the interplay between established precedent in varying areas of the law." *Id.* at 215. Because the least intrusive means analysis is part and parcel of T.W.'s basic legal theory concerning the scope of the protective search, the Majority errs in finding waiver.

In both the trial court and the Superior Court, T.W. raised the issue of whether Officer Grant's reach into T.W.'s pocket exceeded the scope of a *Terry* protective search in light of the facts within the officer's ken. Before the trial court, T.W. "argued that Officer Grant exceeded the scope of a permissible [*Terry*] search when he entered [T.W.'s] left pants pocket and removed what [T.W.] argues Officer Grant should have already realized was not [] a firearm." TCO at 4. In his Pa.R.A.P. 1925(b) statement, T.W. asserted that the trial court "erred in denying the defense motion to suppress physical evidence, as [T.W.] was searched and arrested without probable cause." As the Majority observes, T.W. presented a virtually identical issue in his brief to the Superior Court. Before both of the lower courts, T.W. claimed that Officer Grant exceeded the permissible scope of the search because Officer Grant lacked probable cause.

The lack of probable cause was mere support for T.W.'s fundamental contention that Officer Grant exceeded the scope of the *Terry* search in light of the facts known to him. *See* T.W.'s Brief to the Superior Court, 2390 EDA 2018, at 9 ("A frisk is limited to a flat-handed pat-down for weapons and does not permit a cursory search for evidence or anything other than a weapon."); *id.* at 7 (asserting that the officer exceeded the narrow scope of the *Terry* exception because "after patting him down, and feeling nothing consistent with a weapon, the officer[] searched his pocket"). Neither T.W. nor this Court are constrained by the specific argument that T.W. advanced in the lower courts in furtherance of the issue that he raised and preserved. It is T.W.'s fundamental legal issue, not his supporting argument, that provides the limit on our review. That issue asks whether Officer Grant exceeded the permissible scope of the protective search because the severity of the intrusion was not proportional to the facts within his knowledge.

An assessment of the permissible scope of a protective search must address the subsidiary issue of whether Officer Grant employed the least intrusive means of searching T.W. for weapons. Contrary to the Majority's view, a police officer's obligation to utilize the least intrusive investigative steps reasonably available is clear from *Terry*'s admonition that the scope of the search be "*confined . . . strictly to what [i]s minimally necessary* to learn whether [a suspect is] armed and to disarm [him] once" a weapon is discovered on his person that could be used to assault the officer. *Terry*, 392 U.S. at 30 (emphasis added). That assessment necessarily encompasses the question of whether a police officer must provide a more detailed description of the object—at the very least something more than "hard"—in order to escalate immediately from a pat-down to pocket-

picking, and whether a middle-ground tactic is available to the officer when a protective frisk fails to assuage his initial concerns given the subsequent discovery of some object that is not immediately identifiable as innocuous. In other words, the facts supporting the officer's suspicion and the investigative measures reasonably available to the officer are interconnected considerations, and both of them inform the assessment of whether the totality of the circumstances demonstrates that the search was "confined in scope to an intrusion reasonably designed to discover" a weapon. *Id.* at 28.

As framed by T.W., the question presented to this Court encompasses the issue of whether Officer Grant exceeded the permissible scope of a protective search by failing to use the least intrusive means reasonable available given the facts within his knowledge. We granted review in order to "clarify the issue left unresolved by" our split decision in *Commonwealth v. Taylor*, 771 A.2d 1261 (Pa. 2001) (plurality), regarding the standards that govern a police officer's authority to "conduct an additional more intrusive search of a pocket following a pat-down for weapons." *In re T.W.*, 237 A.3d 416 (Pa. 2020) (*per curiam*). As the competing opinions in *Taylor* demonstrate, the unsettled issue of the legality of the more invasive search of Taylor's pocket for weapons—*i.e.*, the scope of the *Terry* search—inextricably was bound up with the Court's assessment of the quantum of evidence needed to justify the investigating officer's suspicions that Taylor was armed and dangerous. *See Taylor*, 771 A.2d at 1265 (Opinion Announcing Judgment of Court) ("We granted [review] . . . to consider whether the *searches* conducted in the basement were beyond the scope of the warrant . . . .") (emphasis added); 1269 (noting that "the scope of a *Terry* frisk is limited to that which is necessary for the discovery of weapons"); 1270 (opining that the officer who searched Taylor "did not exceed the scope of a proper *Terry* frisk," in contrast with the officer in *Commonwealth v. Graham*, 721 A.2d 1075 (Pa. 1998), who unlawfully searched the appellant's pocket and seized a Lifesaver Holes bottle containing contraband); *accord id.* at 1275 n.5 (Nigro, J., concurring and dissenting) ("In my view, although Officer Adams may have had reasonable suspicion to frisk Taylor in order to insure that he was not armed, once Officer Adams patted Taylor's pocket and felt a cylinder object of approximately four inches in length and one and three-quarters in diameter, which he determined was neither a gun nor a knife, Officer Adams was not constitutionally justified in further searching Taylor's pocket and seizing the pill bottle." (citing *Terry*, 392 U.S. at 27; *E.M.*, 735 A.2d at 660-61)).

By its plain terms then, the broad question before us fairly subsumes consideration of the full ambit of a permissible *Terry* search in light of the known characteristics of a particular object found on a suspect's person. The question and its constituent inquiries have been preserved for our review. This Court's resolution of those questions is not limited to the answers suggested by the parties at either this stage of the litigation or the earlier stages. Our obligation to create legally sound precedent mandates an assessment of whether the facts within the officer's knowledge demonstrated that the scope of the

## V. Conclusion

From time to time, suppression courts, in unintentional dereliction of their duty to scrutinize and where necessary check the government's power, stare at the accused's protection against unlawful searches and seizures with glazed eyes. It is perhaps tempting simply to defer to the facts and subjective conclusions provided in the police officer's testimony and, without thorough analysis, conclude that the testimony demonstrated the requisite level of suspicion. On review, appellate courts sometimes perpetuate that error, blindly accepting the lower courts' reasonable suspicion determinations. Our precedents require that judges instead employ a heedful and principled analysis.

Perhaps as a natural consequence of police work and its frequent dangers, law enforcement officers may sometimes mistake innocuous circumstances as grave hazards. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1143 (9th Cir. 2000) (*en banc*) (Kozinski, J., concurring) ("Just as a man with a hammer sees every problem as a nail, so a man with a badge may see every corner of his beat as a high crime area."). The judiciary is not the police; it falls to our courts to exercise a healthy skepticism rather than a blind credulity when it considers these challenging circumstances. Otherwise, we would uniformly and reflexively elevate the undoubtedly salutary objectives of law

---

protective search was "confined . . . strictly to what [i]s minimally necessary to learn whether [a suspect is] armed." *Terry*, 392 U.S. at 30.

Here, Officer Grant offered scant testimony about the "hard object" in T.W.'s pocket. He was equivocal at best when asked about his concerns, even suggesting that the object could have been narcotics. He failed to articulate sufficient facts demonstrating a reasonable fear that T.W. was armed, let alone "presently dangerous." *Id.* at 30. On this bare-bones record, Officer Grant's decision to forego less invasive investigative measures, *e.g.*, external manipulation of the object, and to instead reach directly into T.W.'s pocket and remove the medicine bottle he felt therein exceeded the lawful scope of a protective search under the Fourth Amendment.

enforcement over the individual security and privacy guaranteed by the Fourth Amendment, thereby relegating an indispensable protection among "the catalog of indispensable freedoms" to a "mere second-class right."  *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting).  As Justice Robert Jackson observed,

> Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

> But the right to be secure against searches and seizures is one of the most difficult to protect.  Since the officers are themselves the chief invaders, there is no enforcement outside of court.

*Id.* at 180-81.  The judiciary's duty to enforce the protections of the Constitution is not limited only to the "more flagrant abuses."  *Id.* at 181.  The competing interests that the *Terry* Court grappled with persist in every protective search case.  No matter how banal these intrusions may appear to some, their dangers persist.  The dangers of a protective search are realized when the amorphous reasonable suspicion standard becomes a hollow artifice used to preclude suppression.

We are called upon here to maintain a necessary equilibrium between the competing state and private interests.  Doing so requires a refinement of the scope of the standard in light of the facts at hand.  Through a careful analysis, which ensures that the Commonwealth demonstrated the officer employed the least intrusive means reasonably available, the court confirms that officer safety concerns do not become a license to rummage and seize at will.  The Majority fails at this task.  In the view of my learned colleagues, the most intrusive aspect of a protective search may occur when reasonable suspicion is at its nadir.  In so holding, the Majority allows for a world in which virtually all

persons subject to a frisk also are subject to a more intrusive search inside their clothing. This utterly dissolves the balance struck in *Terry*. *See United States v. Askew*, 529 F.3d 1119, 1126 (D.C. Cir. 2008) ("When the Supreme Court has weighed the interests relevant to determining whether a certain type of official conduct is reasonable under the Fourth Amendment, lower courts are not free to strike a new and different balance.").

I would toe the line drawn in *Terry*. Indeed, I think that we are bound to do so. That line leads me to conclude that Officer Grant exceeded the scope of the permissible search upon reaching inside T.W.'s pocket in circumstances where he instead possessed solely the authority to manipulate the object from outside of the clothing. The basic Fourth Amendment principle that more invasive searches require additional justification necessitates this conclusion. While I agree with the Majority that a reasonable suspicion standard, not probable cause, controls, I disagree that Officer Grant employed the least intrusive means reasonably available in light of the circumstances at hand. Therefore, the promethazine and derivative evidence should have been suppressed.